******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* FRED C.*
(AC 37114)

DiPentima, C. J., and Prescott and Bishop, Js.

*Argued May 16—officially released August 16, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Mullarkey, J.)

*Kirstin B. Coffin*, assigned counsel, for the appellant (defendant).

*Jonathan M. Sousa*, special deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Richard Rubino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Fred C., appeals from the judgment of conviction, rendered after a jury trial, of three counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (3) and one count of criminal violation of a protective order in violation of General Statutes § 53a-223 (a).[1] The defendant raises two claims on appeal. First, he claims that the court abused its discretion in denying his motion for a new trial as to one of the assault charges on the ground that forensic evidence demonstrated that it was physically impossible that he committed that assault. Second, he claims that his constitutional rights "to due process, [to] a fair trial, to present a defense, and to confront witnesses against him" were violated when the court issued a coercive perjury advisement to a witness and that, he argues, deprived him of exculpatory evidence at trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 2 a.m. on July 28, 2012, after following the victims, G, P, and R, to a residence in Hartford, the defendant stabbed all three of them with a curved knife. First, the defendant cut G's ear, then pinned her against a grill and stabbed her multiple times in her back and buttock, resulting in puncture wounds to her back, a collapsed lung, and a nearly torn off ear. The defendant then turned to P, stabbing her nine times in her chest and side, leaving her paralyzed. The defendant and P have two children together, but due to prior domestic violence, a full no contact protective order had been issued by the court against the defendant in favor of P. The order was in effect on July 28, 2012. As to the third victim, when R, P's mother, tried to intervene, the defendant stabbed her in her right leg. After the assaults of the victims, the defendant left the area.

Hartford police officers responded to the scene and observed the victims, their injuries, and a significant amount of blood on the grass, courtyard, and walkway in the vicinity of the assaults. Paramedics transported the victims to the hospital, where officers collected their bloodstained clothing as evidence.

Police later arrested the defendant and questioned him at the police station. At the time of the defendant's arrest, officers noticed bloodstains on his clothing and a dried bloodstain on his right hand. Officers collected the defendant's bloodstained clothing, swabbed the bloodstain on his hand, and collected a sample of his DNA. Thereafter, the police sent the clothing, the swab, and the defendant's DNA sample to the state forensics laboratory for testing.

At the state forensics laboratory, state forensics technician Kristen Madel tested various cut out portions of bloodstains from the defendant's clothing, the swab from the blood found on his hand, and DNA samples

from the defendant and all three victims. Madel's testing revealed P's DNA as contributing to the blood on the defendant's clothing and in the blood swabbed from his hand. Madel did not detect G's or R's DNA on any of the tested samples.

On February 19, 2014, the state, in a long form information, charged the defendant with three counts of assault in the first degree in violation of § 53a-59 (a) (3), one count each for stabbing P, R, and G, and one count of criminal violation of a protective order in violation of § 53a-223 (a). The state also charged the defendant with two counts of violating his probation pursuant to General Statutes § 53a-32 by way of separate informations tried to the court. Following a jury trial, the defendant was convicted of all counts, and, subsequently, the court found the defendant to have violated his probation. On May 13, 2014, the court sentenced the defendant to a total effective sentence of twenty-one years and one day incarceration, followed by ten years of special parole. This appeal followed. Additional facts will be set forth as necessary to our assessment of the issues on appeal.

I

The defendant first claims that the court abused its discretion in denying his motion for a new trial. Specifically, the defendant argues that, with respect to the count alleging that he assaulted G, the jury's verdict was based on physically impossible factual conclusions. To support this argument, the defendant contends that the absence of G's DNA on his body and clothing renders his assault of her physically impossible.[2] We disagree.

The following additional facts and procedural history are relevant to our review of this claim. On March 31, 2014, following the guilty verdicts, the defendant filed a motion for a new trial, arguing "that the jury's verdict was clearly against the weight of the evidence . . . ." More specifically, the defendant argued that there were inconsistencies between the DNA evidence and the eyewitness testimony that implicated him. On May 13, 2014, during the defendant's sentencing hearing, the court heard oral argument on the defendant's motion. At the hearing, the defendant argued that the absence of G's DNA from the tested blood samples contradicted the testimony of G and other eyewitnesses who stated that the defendant had stabbed G. According to the defendant, if he had stabbed G, her blood would have been found on his person or clothing and, reciprocally, the absence of her blood from the tested samples meant that he could not have stabbed her. Accordingly, he asserted, the jury's conclusion that he had stabbed G was undermined by the evidence.

In response, the state argued that Madel's trial testimony had provided the jury with two reasonable expla-

nations for the lab not detecting G's DNA on the tested samples. The state pointed out that Madel had testified that she did not test every single bloodstain on the defendant's clothing, but selected various stains on his clothing for testing. Additionally, the state noted that Madel had explained during her trial testimony that one DNA source could outcompete another DNA source, thereby concealing the presence of the outcompeted source on the material under examination. Accordingly, the state argued that Madel's explanations refuted the defendant's claim of physical impossibility. In reply, the defendant conceded that R's DNA could have been outcompeted because she was injured less severely and bled less heavily, but argued, nevertheless, that such an occurrence could not have prevented the detection of G's DNA because she had suffered more serious injuries. According to the defendant's reasoning, G's blood would have had to be present on the defendant if he were the perpetrator. After hearing argument, the court denied the defendant's motion for a new trial.

"The proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict and a motion for a new trial is the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Ward*, 76 Conn. App. 779, 786, 821 A.2d 822, cert. denied, 264 Conn. 918, 826 A.2d 1160 (2003). "We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . A verdict must stand if it is one that a jury reasonably could have returned and the trial court has accepted." (Internal quotation marks omitted.) *Bolmer* v. *McKulsky*, 74 Conn. App. 499, 510, 812 A.2d 869, cert. denied, 262 Conn. 954, 818 A.2d 780 (2003).

"Although the jury is ordinarily the sole arbiter of the facts in a criminal case, its power is not absolute. . . . The court serves a supervisory function vis-a-vis the jury. . . . In passing upon a motion to set aside a verdict, the trial judge must do just what every juror ought to do in arriving at a verdict. The juror must use all his [or her] experience, his [or her] knowledge of human nature, his [or her] knowledge of human events, past and present, his [or her] knowledge of the motives which influence and control human action, and test the evidence in the case according to such knowledge and render his [or her] verdict accordingly. A juror who did not do this would be remiss in his [or her] duty. The trial judge in considering the verdict must do the same, or fail in the discharge of that function which the law has laid upon him [or her]; and if, in the exercise of all his [or her] knowledge from this source, he [or she]

finds the verdict to be so clearly against the weight of the evidence in the case as to indicate that the jury did not correctly apply the law to the facts in evidence in the case, or were governed by ignorance, prejudice, corruption or partiality, then it is his [or her] duty to set aside the verdict. . . . In such a case, [a] verdict may be set aside even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury. . . .

"One cogent reason for overturning the verdict of a jury is that the verdict is based on conclusions that are physically impossible. [A] verdict should be set aside [w]here testimony is thus in conflict with indisputable physical facts, the facts demonstrate that the testimony is either intentionally or unintentionally untrue, and leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ." (Citations omitted; internal quotation marks omitted.) *State* v. *Hammond*, 221 Conn. 264, 267–68, 604 A.2d 793 (1992).

With that legal context, we turn to the defendant's specific arguments on appeal in support of his motion. On the basis of our review, we conclude that the defendant's arguments do not support a claim that the verdict was based on a physical impossibility. In essence, the defendant simply seeks to reargue the facts already assessed by the jury. He claims that if he had stabbed the three victims, as asserted by the state, DNA evidence from the blood of all three victims should have been found on him and the absence of any incriminating DNA of a particular victim rendered the state's accusations as to that victim physically impossible. At trial, however, the state's expert witness offered two reasonable explanations for the testing results. First, the expert explained that she did not test every specimen of blood, but selected a limited number of the bloodstain specimens for testing, and, second, she indicated that under certain circumstances, a DNA sample may be blanketed by another, more potent, specimen. From this explanation, the jury could reasonably have inferred that even though G's blood was not among the randomly tested samples, other evidence presented at trial inculpating the defendant—at trial, two eyewitnesses testified that the defendant stabbed the victims—provided a sufficient basis for his conviction. See *Jones* v. *State*, 165 Conn. App. 576, 604,      A.3d     , cert. granted on other grounds, 322 Conn. 906,      A.3d     (2016). Additionally, as noted, the expert explained that the testing may not have identified G's DNA because some DNA sources can outcompete other DNA sources. For example, as Madel explained, a victim who bleeds more can washout the presence of DNA from a victim who bleeds less. Similarly, the blood of a victim who is stabbed after another victim can cover the prior victim's blood, rendering the prior victim's blood and DNA not detectable. In light of this testimony, the jury had a reasonable

basis to convict the defendant of all three assaults, even in the absence of DNA evidence from all three victims. Because there was a reasonable interpretation of the evidence that supported a finding of guilt, the court's denial of the defendant's motion for a new trial was not an abuse of discretion.

## II

The defendant next claims that the court violated his constitutional rights "to due process, [to] a fair trial, to present a defense, and to confront witnesses against him" by issuing a strongly worded perjury admonition to P during a suppression hearing, which, he argues, "intimidated [P] into testifying more favorably for the [state]" at trial. In response, the state argues that the court's perjury admonition was warranted because P had given factually inconsistent testimony, and, alternatively, that the court's advisement lacked the coercive force necessary to infringe on the defendant's sixth amendment right. We agree with the state.

As a preliminary matter, we note that the defendant did not object to the court's perjury admonition and now seeks review of this unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[3] Because the record is adequate for review, and the defendant's claim is of constitutional magnitude, we review it pursuant to *Golding*.

The following additional facts and procedural history are relevant to our review of this claim. Following jury selection, the defendant moved to suppress certain statements he had given to police following his arrest. The court held a hearing on the defendant's motion on February 26, 2014, during which the state called P as a witness. In response to the state's line of questioning about whether she had seen the defendant at the crime scene during the incident, P gave three factually inconsistent responses. First, when the state asked P if she had seen the defendant stabbing G, P answered, "I don't see—I don't know, I didn't see nothing. I went toward there and after that, all I see is me on the floor and all I remember I'm on the floor." Next, when the state asked P if she had tried to stop "the defendant [from] stabbing [G]," P answered, "I know I approached him. I don't know what I did. . . . [A]fter that, I guess I got stabbed or whatever the case may be, and I ended up on the floor." Finally, P testified that she did not see the defendant at the crime scene, but that "[s]omebody was there. Honestly, somebody was there, I wouldn't— I approached [him]—somebody, I don't remember nothing, I was there, I approached him."

In response to P's inconsistent testimony, the court asked the state whether she had given a written statement to the police. The state responded that P had not given a written statement. The court then advised P as follows:

"The Court: Do you understand the penalty for perjury?

"[P]: Yes. I do.

"The Court: What is it?

"[P]: That I go to jail.

"The Court: Five years, five thousand dollars.

"[P]: Okay. Okay.

"The Court: You understand that?

"[P]: Yes. I do.

"The Court: You want a lawyer?

"[P]: No. I don't. I'm not lying. Sir, you think I'm lying?

"The Court: Yes. I think you're lying and I want to give you a chance to talk to a lawyer before you lie anymore.

"[P]: So if you want, I'll get a lawyer, a paid lawyer.

"The Court: And how are you going to pay a lawyer?

"[P]: I will find money. I get money. I'll find it.

"The Court: Who do you get money from?

"[P]: I get money from the state. I just got my taxes. I do work. I could get a job.

"The Court: Well if you can't, we'll appoint a lawyer for you."

Defense counsel did not object to these comments and P concluded her testimony. Before dismissing P as a witness, the court again recommended that she consult an attorney before testifying at trial. The court commented: "All right. You're excused until [trial]. I would suggest you consult with an attorney between now and then and have an attorney with you." After the hearing and before the commencement of the trial, the court appointed counsel for P.

At trial and while P was represented by counsel, the state called her as a witness. She testified that the defendant was at the crime scene during the incident, but that she did not see him stab either her or G. Counsel for the defendant did not cross-examine P about her conflicting suppression hearing testimony regarding the defendant's presence at the crime scene, and, after the state rested, the defendant did not call P as a witness for the defense.

On appeal, the defendant argues that the court's strongly worded perjury admonition during the suppression hearing intimidated P to alter her testimony at trial in favor of the state regarding the defendant's presence at the crime scene. He further argues that the court's intimidating advisement deprived him of exculpatory evidence, specifically, testimony that he was not at the crime scene when P was stabbed.[4] Accordingly, he contends, the court's admonition violated his constitutional

rights to due process, to a fair trial, to present a defense, and to confront witnesses against him.

"The defendant has a fundamental constitutional right to present a defense. . . . The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . The defendant's right to present a defense is not absolute, however; [t]he right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. . . .

"The function of the court in a criminal trial is to conduct a fair and impartial proceeding. . . . A trial judge in a criminal case may take all steps reasonably necessary for the orderly progress of the trial. . . . When the rights of those other than the parties are implicated, [t]he trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. . . . Accordingly, it is within the court's discretion to warn a witness about the possibility of incriminating himself." (Citations omitted; internal quotation marks omitted.) *State* v. *Tilus*, 157 Conn. App. 453, 474–75, 117 A.3d 920, cert. granted on other grounds, 317 Conn. 915, 117 A.3d 854 (2015).

In exercising such discretion, however, the court may not threaten a witness into remaining silent or "effectively [drive] that witness off the stand . . . ." *Webb* v. *Texas*, 409 U.S. 95, 98, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972). In *Webb*, the trial judge singled out one witness "for a lengthy admonition on the dangers of perjury." Id., 97. The trial judge admonished the witness as follows: "Now you have been called down as a witness in this case by the [d]efendant. It is the [c]ourt's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the [c]ourt will personally see that your case goes to the grand jury and you will be indicted for perjury and the [likelihood] . . . is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the [c]ourt wants you to thoroughly under-

stand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking." (Internal quotation marks omitted.) Id., 95–96. After this admonition, the witness "refused to testify for any purpose and was excused by the court." Id., 96. Upon review of the judge's admonition, the United States Supreme Court concluded that the judge had not merely warned the witness about his testimony, but had threatened the witness not to testify using "unnecessarily strong terms" which "exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." Id., 98. Consequently, the judge's admonition "effectively drove that witness off the stand" in violation of the defendant's constitutional rights. Id., 98.

In the case at hand, the court's comment was in direct response to P's question as to whether the court believed that she was lying. To that question, the court answered, "yes," and the court continued with an admonition to her to consult an attorney. Unlike *Webb*, the court, in the case at hand, did not threaten the witness. Although the court's answer to P's question was direct and forceful, it did not contain the character of coerciveness found on review in *Webb*. Rather, the court strongly advised P regarding the consequences of perjury, for which her factually inconsistent testimony provided a basis. At no point did the court tell or even suggest to P which version of her testimony—either that she saw the defendant, did not see the defendant, or did not remember anything—she should relay at trial. Rather, the court noted the presence of inconsistent testimony and, accordingly, advised the witness about the consequences of perjury. In giving this admonition, the court was fulfilling a judicial responsibility. See *State* v. *Tilus*, supra, 157 Conn. App. 475. Further, unlike the procedural facts of *Webb*, P did not refuse to testify after the court's warning; instead, she consulted with counsel and then testified at trial. To the extent the defendant believed that P's suppression testimony was more favorable to him, he could have cross-examined her about the apparent inconsistencies between her suppression and trial testimony. See *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct 597, 93 L. Ed. 2d 598 (1986). The defendant did not avail himself of this opportunity. Accordingly, the defendant was not deprived of the opportunity to elicit potentially beneficial testimony from P by the court's admonition to her regarding the potential consequences of perjury. Under these circumstances, we conclude that the court's strongly worded admonition did not drive P from the witness stand or infringe upon the defendant's

constitutional rights. Thus, the defendant has failed to establish a violation of his constitutional rights as is required to satisfy the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of criminal violation of a protective order, we decline to identify the victim or others through whom the victim's identity may be ascertained.

[1] The court, by way of two other separate informations, also found the defendant to be in violation of his probation pursuant to General Statues § 53a-32. The defendant has not challenged that finding on appeal.

[2] Initially at trial, the defendant's motion for a new trial was based on the absence of G's and R's DNA from the various tested samples taken from his hand and clothing. Before the trial court, however, he waived his claim as it pertained to R and, accordingly, pursues his claim only as it relates to G on appeal.

[3] Pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . [T]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable . . . and under those two prongs, [t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error." (Citations omitted; internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 743–44, 91 A.3d 862 (2014); see also *In re Yasiel R.*, 317 Conn. 773, 780–81, 120 A.3d 1188 (2015) (modifying third prong).

[4] According to the defendant, the exculpatory evidence that the court's admonition deprived him of was P's testimony that he was not at the crime scene during the incident. It is not clear how this testimony would tend to exculpate the defendant given that P's blood was found on the defendant's body and clothing. That finding, alone, would tend to refute P's suppression testimony that the defendant was not present when she was stabbed. In fact, given the defendant's acknowledgement in his first claim in this appeal that P's blood was found on him, his first and second claims before this court are inherently contradictory.