# STATE OF CONNECTICUT *v.*
# ANTHONY COLLYMORE
# (SC 19868)

Palmer, McDonald, D'Auria, Kahn,
Ecker and Vertefeuille, Js.

*Syllabus*

Pursuant to *State* v. *Dickson* (322 Conn. 410), in cases in which the state
   seeks to present an in-court identification that has not been preceded
   by a successful identification during a nonsuggestive identification pro-
   cedure, the state must request permission to do so, and the trial court
   may grant such permission only if it determines that there is no factual
   dispute as to the identity of the perpetrator or that the ability of the
   eyewitness to identify the defendant is not at issue.

Convicted of the crimes of felony murder, attempt to commit robbery in
   the first degree, conspiracy to commit robbery in the first degree, and
   criminal possession of a firearm in connection with the shooting of the
   victim, the defendant appealed to the Appellate Court. The defendant
   and two friends, B and V, had driven to an apartment complex intending
   to commit a robbery. B waited in the car while the defendant and V,
   who were armed with guns, attempted to rob the victim. When the
   victim fled, the defendant and V fired gunshots, fatally wounding the
   victim, and then drove with B to the apartment of a friend, O. B, V and
   O gave statements to the police that incriminated the defendant. B
   also inculpated the defendant during his testimony at the defendant's

State *v.* Collymore

probable cause hearing, and V inculpated the defendant when he pleaded guilty to charges related to the shooting. At trial, the state granted B, V and O immunity from prosecution, pursuant to statute (§ 54-47a), in exchange for their testimony during the state's case-in-chief. B, V and O then repudiated their prior statements that incriminated the defendant and testified so as to exonerate him during the state's case-in-chief. The state introduced their prior inconsistent statements and questioned them regarding those statements. On cross-examination, defense counsel questioned B, V and O extensively about their prior, incriminating statements and their new, exculpatory testimony. When B, V and O were later called to testify in the defendant's case-in-chief, the prosecutor informed them that the state was not extending its grant of immunity to their testimony for the defense. The trial court informed B, V and O that the law was unclear as to whether the immunity they already had been granted extended to their testimony as defense witnesses and stated that they should be guided by the advice of their counsel. B, V and O then invoked their fifth amendment rights against self-incrimination. The defendant claimed, inter alia, that the trial court violated his rights to due process and to compulsory process when it improperly permitted the state to revoke the immunity that it had granted to B, V and O. He contended that the testimony of B, V and O would have addressed exculpatory, material and noncollateral matters, and would have rehabilitated his credibility and the credibility of B, V and O. The Appellate Court upheld the defendant's conviction and rejected his constitutional claim, reasoning that the state did not revoke the immunity it had granted to B, V and O when they were called to testify in the defendant's case-in-chief but, rather, refused to grant additional immunity for any transaction, matter or thing not testified to and immunized during the state's case. The Appellate Court also determined, inter alia, that the defendant was not constitutionally entitled to have additional immunity granted to B, V and O because he failed to establish that the additional testimony would have been essential to his defense or would not have been cumulative. The defendant thereafter filed a motion for reconsideration in light of *Dickson*, a case that was decided after his criminal trial but that applied retroactively to all cases then pending on appeal, claiming that the trial court had improperly permitted two witnesses, the victim's mother, R, and the victim's brother, G, to make first time in-court identifications of him as one of the persons who shot at the victim, in violation of the rule that such identifications must be prescreened by the trial court. The Appellate Court denied the motion. On the granting of certification, the defendant appealed to this court. *Held*:

1. The defendant could not prevail on his claim that his rights to due process and to compulsory process were violated when the state declined to extend the immunity that it had granted under § 54-47a to B, V and O during the state's case-in-chief to their testimony during the defendant's

State *v.* Collymore

case-in-chief because, even if that immunity could not be revoked during the defendant's case-in-chief and the state's failure to extend such immunity violated § 54-47a, that violation was not constitutional in nature and, accordingly, did not violate his constitutional rights: to the extent that B, V and O could have invoked their fifth amendment rights even if immunity had been extended to their testimony during the defendant's case-in-chief, the defendant failed to establish that any improper revocation of immunity by the state violated his constitutional rights because the witnesses would not have answered questions for which they validly invoked those rights, and, thus, their testimony in response to those questions would not have been exculpatory; moreover, this court concluded, with respect to those matters for which B, V and O could not have validly invoked their fifth amendment rights if the previously granted immunity had extended to the defendant's case-in-chief, that, even if the state acted unfairly and committed misconduct by engaging in a discriminatory grant of immunity to gain a tactical advantage when it declined to extend immunity to the witnesses' testimony during the defendant's case-in-chief, the defendant failed to establish that the testimony he was prevented from offering during his case-in-chief was not cumulative, as the defendant failed to establish what new information B, V and O would have provided if the state had not declined to extend immunity beyond the state's case; furthermore, the state's purported revocation of immunity, coupled with the trial court's warnings to B, V and O that the law on whether immunity extended to their testimony as defense witnesses was unclear and that they should be guided by the advice of their counsel, did not drive them from the witness stand and, therefore, did not violate the defendant's constitutional rights, as neither the trial court nor the state threatened B, V or O that testifying for the defendant or in a manner unfavorable to the state would lead to perjury charges or to having a plea deal revoked, and the state's informing those witnesses of what it believed to be the scope of § 54-47a was not so coercive or intimidating as to substantially interfere with their decision whether to testify in the defendant's case-in-chief.

2. The defendant could not prevail on his claim that his right to due process was violated, pursuant to *Dickson*, when R and G purportedly gave first time in-court identification testimony about him, as that testimony, to the extent that it was improper, was harmless beyond a reasonable doubt: contrary to the state's assertion that the rule created in *Dickson* was inapplicable to the unsolicited and unanticipated identification testimony of R and G, all first time in-court identifications are subject to *Dickson*, regardless of whether the state intends or attempts to introduce such an identification, and, because the defendant's identity as a shooter was not at issue as to all of the charges except for criminal possession of a firearm, the testimony of R and G did not implicate the defendant's due process rights as to those charges; moreover, although the defendant's identity as a shooter was at issue with respect to the charge of

State *v.* Collymore

criminal possession of a firearm and, thus, the testimony of R and G implicated the defendant's due process rights with respect to that charge, the admission of that testimony was harmless beyond a reasonable doubt, as the statements of B, V and O to the police and the testimony of other witnesses indicated that the defendant possessed or used a gun during the shooting and that he possessed a gun after the shooting, defense counsel extensively cross-examined G as to his testimony and attacked his credibility, the state's overall reliance on the testimony of R and G was minimal, and, even without their testimony, there was sufficient evidence for the jury to find the defendant guilty beyond a reasonable doubt.

Argued November 7, 2018—officially released January 21, 2020

*Procedural History*

Substitute information charging the defendant with two counts of the crime of attempt to commit robbery in the first degree, and with one count each of the crimes of felony murder, conspiracy to commit robbery in the first degree and criminal possession of a firearm, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Cremins, J.*; verdict of guilty; thereafter, the court vacated the verdict as to one count of attempt to commit robbery in the first degree; subsequently, the court rendered judgment, from which the defendant appealed to the Appellate Court, *Gruendel, Lavine* and *Mullins, Js.*, which affirmed the trial court's judgment; thereafter, the Appellate Court denied the defendant's motion for reconsideration, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Susan M. Hankins*, assigned counsel, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom were *Cynthia S. Serafini*, senior assistant state's attorney, and, on the brief, *Maureen Platt*, state's attorney, for the appellee (state).

State *v.* Collymore

*Opinion*

D'AURIA, J. The primary question in this appeal is whether the defendant, Anthony Collymore, was harmed when the state, after granting immunity to three witnesses under General Statutes § 54-47a for testimony given during the state's case-in-chief, revoked that immunity when the same witnesses later testified in the defense case-in-chief. The defendant appeals from the judgment of the Appellate Court affirming the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1).[1] He claims that his rights to due process and a fair trial under the fourteenth amendment to the United States constitution, and his rights to compulsory process and to present a defense under the sixth amendment to the United States constitution were violated when the trial court improperly permitted the state to revoke the immunity of the three witnesses, causing them to invoke their fifth amendment right against self-incrimination. Additionally, the defendant claims that the Appellate Court improperly denied his motion to reconsider in light of this court's holding in *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810 (2016), cert. denied, U.S. , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), on the ground that two witnesses made improper, first time in-court identifications. Because we conclude that the revocation of immunity did not violate the defendant's

---

[1] The defendant also was found guilty of a second count of attempted robbery in the first degree in violation of §§ 53a-49 (a) (2) and 53a-134 (a) (4), but the trial court vacated that finding at sentencing, pursuant to *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013).

State *v.* Collymore

constitutional rights and that any improprieties regarding the first time in-court identifications were harmless, we affirm the judgment of the Appellate Court.

The following facts, reasonably found by the jury and recited by the Appellate Court in *State* v. *Collymore*, 168 Conn. App. 847, 850–52, 148 A.3d 1059 (2016), and procedural history are relevant to our review of these claims: "On January 18, 2010, the defendant and two of his friends, Rayshaun Bugg and Vance Wilson (Vance), were driving around Waterbury in a white . . . four door, rental Hyundai that the defendant's aunt and uncle had lent to him, looking to rob someone. Eventually the three men drove into the Diamond Court apartment complex, which comprises eight apartment buildings. Halfway down the main road of the complex, the men saw an expensive looking, black Acura sport utility vehicle (SUV) and decided to rob its driver.

"They drove down a small road behind the apartments, where the defendant and Vance pulled out their guns and exited the Hyundai, saying that they were going to rob the driver of the SUV. The defendant had a .38 revolver, and Vance had a .357 revolver. Bugg drove to the end of the small road and waited. The defendant and Vance reached the SUV, saw two young children running toward its driver, and decided to call off the robbery. The SUV drove away.

"The defendant and Vance then saw seventeen year old John Frazier (victim) and decided to rob him. As they were trying to rob him, he slapped away one of their guns and ran toward his apartment, at the entrance to the complex. The defendant and Vance both fired shots at the victim.

"Bugg drove up, the defendant and Vance ran over to the Hyundai and got in, and they sped off to the apartment of Jabari Oliphant, a close friend who lived in Waterbury. There, the defendant and Vance explained

State *v.* Collymore

to Bugg and Oliphant what had just transpired at Diamond Court, namely, that they had intended to rob the man in the SUV but decided not to when they saw his young children; instead, they tried to rob the victim and shot him when he resisted. They then asked Oliphant if he had something to clean their guns.

"Police arrived at Diamond Court within minutes of the shooting and found the fatally wounded victim in front of his family's apartment. An autopsy revealed that a single .38 class bullet through the victim's heart had killed him.[2] The defendant was arrested and tried.

"At trial, the state's case included more than thirty witnesses, who testified over the course of fifteen days. A jury found the defendant guilty, and the court imposed a sentence of eighty-three years in prison." (Footnote in original.) Id. The defendant appealed to the Appellate Court, claiming, in relevant part, that the trial court had violated his constitutional rights to due process and compulsory process by failing to compel Bugg, Vance, and Oliphant to testify during the defense case-in-chief when they invoked their fifth amendment right against self-incrimination after the state improperly revoked the immunity that it had granted these witnesses during the state's case-in-chief. Id., 852.

The Appellate Court rejected the defendant's constitutional claim and affirmed the judgment of conviction, reasoning that, although the state could not revoke immunity it already had granted, his constitutional rights were not violated because the state did not revoke the existing immunity of these witnesses but, rather, refused to grant additional immunity for any transaction, matter, or thing not testified to and immunized during the state's case-in-chief. Id., 865, 867. The defen-

---

[2] "The state's ballistics expert noted that a .38 class bullet could be fired from a nine millimeter pistol, a .38 Special revolver, or a .357 Magnum revolver." *State* v. *Collymore*, supra, 168 Conn. App. 851 n.2.

State *v.* Collymore

dant, according to the Appellate Court, was not consti-
tutionally entitled to have the three witnesses granted
additional immunity because he had failed to establish
that the additional testimony would have been essential
to his defense or would not have been cumulative.
Id., 870–71. Moreover, the Appellate Court determined
that the trial court properly allowed the witnesses to
invoke their fifth amendment privilege regarding ques-
tions not covered by the existing immunity because
responsive answers had a tendency to incriminate the
witnesses and, thus, their invocation of their fifth
amendment right prevailed over the defendant's right
to compulsory process. Id., 873–74, 874 n.14. The Appel-
late Court, however, also determined that the trial court
abused its discretion by allowing the witnesses to
invoke their fifth amendment privilege regarding ques-
tions covered by the existing immunity because their
answers would not have incriminated them but that
this error was harmless because the witnesses already
had testified at length and been subject to cross-exami-
nation on those subject matters. Id., 874–75.

Subsequently, the defendant filed a timely motion for
reconsideration and reargument en banc, in light of this
court's holding in *State* v. *Dickson*, supra, 322 Conn.
410. The Appellate Court summarily denied the defen-
dant's motion.

The defendant petitioned for certification to appeal,
which we granted, limited to the following issues: (1)
"[Did] the Appellate Court properly [hold] that a prose-
cutor's grant of immunity to a witness for his testimony
during the state's case-in-chief does not extend to the
same witness' testimony when later called by the defen-
dant as a witness?" (2) "If the answer to the first ques-
tion is no, was the error nonetheless harmless?" And
(3) "[Did] in-court identification testimony made by the
victim's mother and brother, contrary to their pretrial
statements, [violate] the defendant's due process rights

State *v.* Collymore

pursuant to *State* v. *Dickson*, [supra, 322 Conn. 410]?'' *State* v. *Collymore*, 324 Conn. 913, 153 A.3d 1288 (2017). Additional facts will be set forth as required.

I

The defendant first claims that his rights to present a defense and to due process were violated as a result of the state's revocation of the immunity it previously had granted to former prosecution witnesses under § 54-47a when they later were called as defense witnesses. Specifically, the defendant argues that the Appellate Court improperly characterized the prosecutor's actions as declining to grant additional immunity rather than as revoking existing immunity, which should have extended to his case-in-chief. This mischaracterization, the defendant contends, led the Appellate Court to improperly address his arguments in support of his constitutional claim, namely, that the state acted improperly by intentionally revoking immunity to deprive him of exculpatory testimony from those witnesses and that the state's actions, coupled with the trial court's warnings to the witnesses, improperly drove the witnesses from the witness stand.

Moreover, the defendant argues that he was harmed by the improper revocation of immunity, which caused the witnesses' subsequent, invalid invocations of their fifth amendment rights, because (1) the witnesses' testimony would have addressed exculpatory, material, and noncollateral subject matter, (2) the witnesses' testimony would have rehabilitated their credibility, and (3) the state's actions interfered with his right to control his defense strategy by forcing him to elicit testimony during the state's case-in-chief rather than during the defense case-in-chief.

The state responds that the Appellate Court properly characterized the prosecutor's actions as a refusal to grant additional immunity, not as a revocation of

State *v.* Collymore

existing immunity. The state argues that the defendant
was not constitutionally entitled to have Vance, Bugg,
and Oliphant granted additional immunity because he
failed to establish either prosecutorial misconduct or
that the additional testimony was material, exculpa-
tory, or essential to his defense. Further, the state con-
tends that, to the extent that the trial court improperly
allowed the witnesses to invoke their fifth amendment
right against self-incrimination, this error was harmless
because their testimony would have been cumula-
tive. Even if we assume, without deciding, that the state
violated § 54-47a when it revoked the immunity it pre-
viously granted to Vance, Bugg, and Oliphant, we agree
with the state that this action did not violate the defen-
dant's constitutional rights.

A

The following additional facts and procedural history
are relevant to this claim. Prior to trial, Bugg, Vance,
and Oliphant each had given statements to the police
that incriminated the defendant. Bugg had inculpated
the defendant twice—in his statement to the police
and during his testimony at the defendant's hearing in
probable cause. Vance also inculpated the defendant
twice—in his statement to the police and when he
pleaded guilty to charges related to the incident at issue.
Oliphant likewise incriminated the defendant in the
statement he gave to the police.

When these witnesses were called as prosecution
witnesses at trial, all three invoked their fifth amend-
ment right against self-incrimination and refused to tes-
tify. The state granted immunity to these witnesses
pursuant to § 54-47a in exchange for their testimony.
Specifically, the state granted Bugg "use immunity for
any drug activity he was engaged in on January 18,

State *v.* Collymore

2010.''[3] The state did not specifically grant Bugg *immunity* from prosecution for any false statement made at the defendant's hearing in probable cause, which Bugg was concerned about, but it did concede that it would not prosecute him for any perjury that he may have committed at the hearing in probable cause.[4] The state granted Vance immunity from prosecution for making a false statement in his prior statements.[5] The state granted Oliphant immunity from prosecution for both filing a false statement and hindering prosecution on the basis of his statement to the police.[6]

Despite the witnesses' prior statements that incriminated the defendant, the witnesses repudiated those statements on direct examination in the state's case and testified so as to exonerate him. All three witnesses testified that they did not provide the police with the information contained in the statements and had signed the statements only because they had been coerced by the police. In light of this testimony, the state interrupted the testimony of each witness to call Lieutenant

___

[3] Although the state indicated it was granting Bugg only use immunity, because it granted him immunity pursuant to § 54-47a, it necessarily granted him both use immunity and transactional immunity. See *Furs* v. *Superior Court*, 298 Conn. 404, 410–11, 3 A.3d 912 (2010) (§ 54-47a [b] necessarily provides witness with both use and transactional immunity, and state cannot restrict its offer of immunity to only use or only transactional immunity).

[4] The state then requested that the court inform the jury that Bugg had been granted immunity and was compelled to testify. Over defense counsel's objections, the trial court informed the jury prior to the start of Bugg's testimony that he had been compelled to testify under § 54-47a, although the court did not specifically say that he had been granted immunity.

[5] The state argues that the defendant's claim, as it relates to Vance, fails because the record is inadequate to establish that the state ever granted him immunity. Although it is true that the state did not explicitly grant Vance immunity on the record prior to the start of his testimony, the state did later clarify on the record that it had granted Vance immunity from prosecution for the crime of making a false statement. In light of this clarification, the state's argument fails.

[6] The trial court informed Oliphant that ''you have been given transactional immunity by the state.'' See footnote 3 of this opinion.

State *v.* Collymore

Michael Slavin of the Waterbury Police Department, who testified that he was present when the witnesses made and signed their statements and that the witnesses had not been coerced. Through Slavin, the state then had the statements of Bugg, Vance, and Oliphant read into the record and admitted into evidence for substantive purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

After the statements were admitted under *Whelan*, the state recalled the witnesses and continued with direct examination.[7] The state questioned the witnesses in detail about their prior statements to the police, reading the statements sentence by sentence and asking the witnesses if the information contained in each sentence was correct. Although the state had not yet offered into evidence Bugg's prior testimony from the probable cause hearing or Vance's prior testimony from his plea proceedings for substantive purposes under *Whelan*, it questioned Bugg and Vance about these other prior statements in a fashion similar to its questioning about their prior statements to the police. The witnesses each testified that, to the extent their prior statements and testimony were inconsistent with their trial testimony, the information contained in the prior statements and testimony was incorrect.

Subsequently, on cross-examination, defense counsel questioned the witnesses extensively about all of their prior statements that incriminated the defendant and,

---

[7] For some of the witnesses, there was a delay between the admission of the *Whelan* statements and the recommencement of direct examination. Bugg was not recalled by the state until approximately nine days later, after ten other witnesses had testified on behalf of the state. Vance was not recalled by the state until approximately eight days later (although due to weather, evidence was presented during only two of those eight days), after six other witnesses had testified on behalf of the state. Direct examination of Oliphant recommenced immediately after his prior statement to the police was read into the record.

State *v.* Collymore

especially, about their reasons for making these prior statements.[8] Although at this point in the trial, Bugg's prior testimony from the hearing in probable cause and Vance's prior testimony from his plea proceedings had not been admitted into evidence for substantive purposes under *Whelan*, because the state had questioned Bugg and Vance extensively about their prior testimony and gone through it with them line by line, defense counsel was able to extensively cross-examine them about their prior testimony. Defense counsel also questioned the witnesses about their new exculpatory testimony and the events that occurred on the night of the incident at issue.

At the end of the state's case, after the testimony of these witnesses concluded, the court permitted the state to read into the record Bugg's prior testimony at the hearing in probable cause and Vance's prior testimony at his plea proceedings for substantive purposes pursuant to *Whelan*.

The defense subsequently called these witnesses as defense witnesses in its case-in-chief. Prior to taking the witness stand, the witnesses were informed that the state was not extending its prior grant of immunity to their testimony in the defense case-in-chief and was

___

[8] Bugg testified that he signed his statement to the police and testified at the hearing in probable cause because he was promised a plea deal that limited his period of incarceration to five years. He also alleged that he had been slapped and hit by the officers prior to agreeing to sign the statement.

Vance testified that he signed his statement to the police only so that he would not receive the death penalty and testified at the plea proceedings consistently with the statement only so that he would receive a lesser sentence. Vance testified that not only did he not make a statement to the police but that the language in the statement was inconsistent with how he spoke.

Oliphant testified that he was bullied, beaten, and forced by the police into making a false statement against the defendant. According to Oliphant, he does not speak in the manner used in the statement and never would have used the phrases contained in the statement. He further testified that he was offered a plea deal if he perjured himself and testified in a manner that was consistent with his statement to the police.

State *v.* Collymore

not willing to grant any additional immunity for matters
not covered by the prior grant of immunity. Specifically,
the state clarified that it was "not giving [the witnesses]
immunity for any testimony as a witness in the defense
case." The state argued that the witnesses' testimony
had concluded after the state's case ended and that,
because they no longer were being called as prosecution
witnesses, they did not "have immunity from the state
for anything that [they]—that [they testify] to at this
point on." The court, however, noted that it was unclear
as to whether the immunity that the witnesses already
had been granted by the state extended to their testi-
mony as defense witnesses and that this was an issue
the Appellate Court would have to decide.[9] The court
then cautioned the witnesses that this was an unre-
solved issue, that they may or may not have immu-
nity, and that they should be guided by the advice of
their counsel. Subsequently, while testifying during the
defense case-in-chief, the witnesses each invoked their
fifth amendment rights and refused to answer some or
all of the questions asked. We discuss each witness'
prior statements and trial testimony in turn.

1

As explained, prior to trial, Bugg had inculpated the
defendant twice—in a statement to the police and dur-
ing his testimony at the defendant's probable cause
hearing. In his statement to the police, Bugg informed
the police that, on the date of the murder, he, the defen-
dant, and Vance had been driving around looking for

_____

[9] The defendant never requested that the trial court determine whether
immunity under § 54-47a extended to testimony given during the defense case
but, rather, agreed with the trial court that whether a witness is granted immu-
nity is solely in the hands of the state and that the court could not require that
immunity be granted. When the trial court inquired as to what defense counsel
was seeking from the court, counsel responded that he did not believe that
the court could do anything but nevertheless requested that the jury be advised
that the prior immunity had been revoked. The court declined to give the jury
this instruction.

State *v.* Collymore

women and ended up at Diamond Court. While in the parking lot area, the defendant saw an SUV driving toward them. The defendant and Vance discussed how the man in the SUV probably had money, pulled out their guns, and said they were going to rob him. Bugg saw Vance with a .357 and the defendant with a .38 revolver. The defendant then drove past the SUV and parked in a driveway. The defendant and Vance exited the vehicle and told Bugg to drive. Bugg remained in the vehicle for approximately five minutes and then heard five or six gunshots. He then drove the vehicle toward the SUV. The defendant ran to the vehicle, got into the backseat and said, "this nigga's hot." Vance then ran to the vehicle and also got into the backseat. Bugg drove away and asked if they "got" anything, to which Vance said no and that the boy they tried to rob "tried some wild shit." Bugg asked the defendant if he shot the boy. The defendant did not respond but appeared to be mad at Vance. Bugg drove them to Oliphant's house, where the defendant told Bugg that they did not rob the guy in the SUV but that "we got some young nigga walk[ing] by, holding his pockets, and he wouldn't give it up. [The defendant] said that, because the young nigga wouldn't give it up, [Vance] yapped that nigga. I know that yap means to shoot somebody. They said the guy in the [SUV] had a baby in it, so they felt bad [and] instead took the young nigga. [The defendant] said [Vance] ha[d] his gun to the boy's chest, and the boy tried to grab it and they started to tussle over the gun [and] that is why he shot him." Vance then asked for some ammonia to clean his gun. Vance kept telling everyone to keep their mouths shut. Bugg then left Oliphant's house and went to a strip club with his brother. He later told his cousin, Marquise Foote, about the incident.

After he gave his statement to the police, Bugg testified at the defendant's probable cause hearing. His testi-

State *v.* Collymore

mony was similar to, but not entirely consistent with, the content of his statement to the police. Specifically, Bugg testified that, although he saw Vance with a .357 pistol, he only saw something in the defendant's pocket that he assumed to be a gun.

At trial, on direct examination in the state's case-in-chief, Bugg's testimony differed significantly from his prior statements. He testified that, on the date of the incident, he, the defendant and Vance had been driving around, looking to purchase marijuana. They drove to the area near Diamond Square because Bugg knew of a narcotics dealer there. In the past, when Bugg wanted to purchase marijuana, he would call the dealer, and they would meet at Diamond Court. Although Bugg had not called the dealer prior to the current excursion, he saw the dealer's truck, a dark colored SUV, parked in the parking lot and informed the defendant and Vance that the dealer was in the truck. The defendant then parked down a side street. The defendant and Vance exited the vehicle. Bugg testified that he did not see either of them with a weapon. As Bugg was waiting in the vehicle, he testified, he thought he heard gunshots but was uncertain because music was playing in the vehicle. Bugg then drove toward the SUV and saw the defendant coming toward him, with Vance a couple of feet behind the defendant. The defendant and Vance got into the backseat of the vehicle, and Bugg drove to the defendant's house, where the three men smoked marijuana.[10]

---

[10] The state also questioned Bugg about phone conversations he had had with his sister and mother while he was incarcerated. Bugg testified that he did not recall the substance of the conversations but that he might have told his sister that Vance was willing to help him. He said that he did not recall telling his sister that, if he gave Vance "some kitty," everything would be fine. He did recall telling his mother or sister to tell Foote that they needed to talk so that Foote would tell the truth.

After Bugg's testimony in the state's case concluded, the state played audio recordings of these telephone conversations. In one recording, Bugg told his sister that, if he could "get that nigga' some kitty, and everything's gonna be good." He also informed his sister that "I'm trying to help the other nigga' out."

State *v.* Collymore

On direct examination during the defense case-in-chief, after the state informed Bugg that the prior grant of immunity did not extend to his testimony during the defense case, defense counsel questioned Bugg at length about recorded phone conversations he had had with his sister and mother while he was incarcerated. See footnote 10 of this opinion. Defense counsel asked Bugg to clarify what his statement to his sister about "kitty" meant. He explained that "kitty" meant money but that he had lied to his sister and only said that to calm her down. He testified that the conversation was about Vance's needing to tell the truth because Vance had lied in his statement. Defense counsel then asked Bugg about the nature of his relationship with Foote in January, 2010, to which Bugg responded that "[w]e wasn't cool" because "he stole from me." Defense counsel then inquired about what Foote had stolen from Bugg, in response to which Bugg invoked his fifth amendment right against self-incrimination. Bugg also invoked his fifth amendment right in response to the following questions by defense counsel: (1) where he had driven the vehicle after the defendant and Vance exited to purchase marijuana, (2) where precisely the vehicle he was driving was located at the time the shooting occurred, and (3) if he had told the truth about the vehicle's location during the probable cause hearing.[11]

2

Vance also inculpated the defendant twice prior to the defendant's trial—in the statement Vance gave to

_____

[11] On cross-examination by the state, Bugg invoked his fifth amendment privilege as to four other questions: (1) whether he had testified inconsistently at the hearing in probable cause about whether the purpose of going to Diamond Court was to purchase marijuana, (2) whether he had testified inconsistently during the state's case-in-chief about remembering the telephone conversation with his sister about "kitty," (3) whether he had ever threatened Foote, and (4) whether he failed to inform the police that the reason he, the defendant and Vance had gone to Diamond Court was to purchase marijuana. The defendant, however, does not argue that he was harmed by Bugg's refusal to respond to these questions.

State *v.* Collymore

the police and when Vance pleaded guilty to charges related to the incident at issue. In his statement to the police, Vance stated that, on the day of the incident, he was with the defendant and Bugg when the defendant stated that he wanted to commit a robbery to get money to buy his son a birthday present. Vance agreed to help the defendant commit the robbery. He testified that the defendant drove them to an apartment complex where they saw a black SUV. The defendant parked behind one of the apartment buildings. Then, the defendant and Vance took out their guns and got ready to rob the driver of the SUV. Vance stated that he had a .357 revolver and that the defendant had a .38 revolver. The defendant and Vance exited the vehicle while Bugg remained in the vehicle. According to Vance, he and the defendant decided not to commit the robbery when they saw two children run toward the SUV. Vance and the defendant then saw the victim walking in the street and decided to rob him instead. Vance stated that he ran up behind the victim as the defendant put a gun to the victim's chest. The victim, however, slapped the gun away and ran toward the entrance of the apartment building. The defendant and Vance chased after him, and the defendant started shooting at the victim, firing two or three gunshots. Vance testified that, when he saw a woman and a man open the front door of the apartment the victim was running toward, he fired two or three gunshots at the door to scare them. Bugg then drove toward the defendant and Vance, who got into the backseat, and Bugg drove to Oliphant's house. The defendant commanded Vance to give him his gun so that the defendant could get rid of the guns, and Vance complied. Vance stated that he was not certain whether he or the defendant had shot the victim.

Subsequently, Vance again inculpated the defendant during his testimony in the proceedings in which Vance pleaded guilty to charges stemming from his participa-

State *v.* Collymore

tion in the incident at issue.[12] During the plea proceedings, Vance's prior statement to the police was read into the record, and Vance swore to its veracity. Additionally, in response to questions by the prosecutor, Vance's reiteration of the events of the incident at issue was mostly consistent with his statement to the police, with a few minor deviations.

Then, at the defendant's trial, on direct examination during the state's case, Vance testified that, approximately one month prior to the incident at issue, he had given the defendant ten blocks of heroin that the defendant was supposed to, but never did, pay for. On the day of the incident, the defendant called Vance, stating that, if Vance went with him to collect money from a man, he would give Vance the money. Vance agreed. Subsequently, the defendant, Vance, and Bugg drove to Diamond Court. Once at Diamond Court, the defendant saw the man who owed him money coming out of one of the apartment buildings with two children. Vance and the defendant exited the vehicle, and Bugg drove away. The man and the children quickly got into a vehicle and drove away. Vance argued with the defendant over the defendant's failure to ask the man for the money. Vance then punched the defendant, in response to which the defendant appeared to reach inside his clothing for a gun. Believing that the defendant had a gun, Vance grabbed the Taurus Magnum .357 gun at his hip and fired seven gunshots in the defendant's direction. The defendant ran toward where Bugg had parked their vehicle and was not struck by any of the bullets. Vance did not think he shot anyone. The defendant and Vance got into the backseat of the vehicle, and Bugg drove to the defendant's house. Vance testified that he expected his statement to the police to

_____

[12] Although Vance had pleaded guilty pursuant to a plea deal at the time of the defendant's trial, he had not yet been sentenced because his sentence was contingent on whether he testified truthfully at the defendant's trial.

State *v.* Collymore

contain a recitation of these facts, including an admission that he might have killed the victim accidentally with a stray bullet when he shot at the defendant. Defense counsel then extensively cross-examined Vance about the events at issue and his prior statements.

During the defense case-in-chief, because Vance had stated that he would not respond to any questions, the trial court, outside the presence of the jury, ordered defense counsel to make an offer of proof. Vance refused to answer any questions. Specifically, he invoked his fifth amendment privilege against self-incrimination in response to the following questions: (1) what promises did the police officers make to him at the time he signed his statement to the police, (2) did he shoot the victim, (3) what did the detectives tell him about signing his statement, and (4) did he make a telephone call to Karen Atkins in June, 2012. Defense counsel did not ask Vance any further questions, despite the trial court's advising him to make a record of any questions he wanted to ask. Because Vance invoked his fifth amendment privilege in response to every question asked, the trial court ruled that Vance could not be called to testify merely to invoke his fifth amendment privilege against self-incrimination.

3

In his prior statement to the police, Oliphant stated that Vance and the defendant had come to his house on the night of the murder. Vance informed Oliphant that he had killed the victim and that the defendant had been with him when the murder occurred. Vance and the defendant told Oliphant that they had gone out looking to rob someone but that, when they tried to rob the victim, he fought back and ran away, after which Vance chased him and shot him in the back. Oliphant stated that he previously had seen Vance with a .357 gun and that Vance had told him he had used that gun

State *v.* Collymore

to shoot the victim. Oliphant also stated that he knew that the defendant had a .38 revolver.

At the defendant's trial, on direct examination in the state's case-in-chief, Oliphant testified that, on the night of the murder, the defendant, Vance, and Bugg came to his house. While Vance and Oliphant were alone in the bathroom, Vance told Oliphant that he had killed the victim and wanted to kill the defendant and Bugg to eliminate all witnesses. Soon after the conversation in the bathroom, Vance, Bugg, and the defendant left the house together. At a later date, Vance told Oliphant more details, including that he had shot at the victim approximately five times. Oliphant testified that, a couple of days after the murder, he also questioned the defendant about the murder but that the defendant did not want to talk. Oliphant testified that, subsequently, while he and Bugg were riding in a vehicle, Bugg told him that, on the night of the murder, they had been riding around, drinking and smoking marijuana when Vance got out of the vehicle and tried to rob the victim. The victim attempted to fight off Vance, who then shot the victim and got back into the vehicle. Oliphant further testified that he previously had seen Vance with a .357 gun but never had seen the defendant with a gun.

After the state's case-in-chief, Oliphant was called as a defense witness. Prior to the start of Oliphant's testimony, his counsel informed the trial court that Oliphant would not testify, "[b]ased on the representation that immunity will not be extended to [his] being called as a defense witness.'' The court then ordered that defense counsel make an offer of proof outside the presence of the jury.

On direct examination during the offer of proof, Oliphant answered two questions, stating (1) that he had been arrested for drug possession in 2011, and (2) that he did not know anyone named Jamel Waver but

State *v.* Collymore

that he previously had been arrested with a man named
Jamel, whose surname he did not know. Oliphant, how-
ever, invoked his fifth amendment privilege against self-
incrimination in response to two other questions: (1)
whether he was beaten while in police custody, and (2)
whether he previously testified during the state's case-
in-chief that he felt guilty about Vance. Defense counsel
did not ask any other questions, despite the trial court's
warning that there needed to be a complete record.

On cross-examination, the state asked three questions
regarding Oliphant's relationship with Jamel, including
whether Oliphant possessed narcotics when they were
arrested together in 2011, but Oliphant invoked his fifth
amendment right in response to all three questions.[13]
The state argued that, because Oliphant had invoked
his fifth amendment right in response to all questions
posed by the state on cross-examination, his testimony
on direct examination would have to be stricken, and,
thus, he could not be called to testify before the jury.
The court agreed, citing *State* v. *Person*, 215 Conn. 653,
577 A.2d 1036 (1990).

B

We now turn to the defendant's claim. He contends
that his rights to due process and compulsory process
were violated when the state improperly revoked the
immunity it had granted to Bugg, Vance, and Oliphant
under § 54-47a. "[A] defendant has a right under the
compulsory process and due process clauses to present
[his] version of the facts as well as the prosecution's
to the jury so [that] it may decide where the truth lies.
. . . The compulsory process clause of the sixth
amendment generally affords an accused the right to
call witnesses whose testimony is material and favor-
able to his defense . . . ." (Citations omitted; internal

_____

[13] The defendant does not argue that he was harmed by Oliphant's invocation
of his fifth amendment right in response to questions by the state on cross-
examination during the defense case-in-chief.

State *v.* Collymore

quotation marks omitted.) *State* v. *Holmes*, 257 Conn. 248, 253, 777 A.2d 627 (2001), cert. denied, 535 U.S. 939, 122 S. Ct. 1321, 152 L. Ed. 2d 229 (2002). "The issue of whether a defendant's rights to due process and compulsory process require that a defense witness be granted immunity is a question of law and, thus, is subject to de novo review." Id., 252; see also *State* v. *Kirby*, 280 Conn. 361, 403, 908 A.2d 506 (2006) (same). The defendant's claim is premised on an alleged violation of § 54-47a.[14] He argues that, once the state granted the three witnesses immunity under § 54-47a, the statute provided them with immunity during both the state's case-in-chief and the defense case-in-chief.[15] Even if we assume, without deciding, that, once the state granted these witnesses immunity under § 54-47a,[16] this immunity extended throughout the entire trial and could not

[14] Section 54-47a (a) permits a prosecutor to apply to the court for an order directing a witness, who has invoked his fifth amendment privilege against self-incrimination, to testify if the prosecutor determines that the testimony of the witness "in any criminal proceeding involving . . . felonious crimes of violence . . . or any other class A, B or C felony . . . [is necessary to obtain] sufficient information as to whether a crime has been committed or the identity of the person or persons who may have committed a crime . . . [and] is necessary to the public interest . . . ."

Section 54-47a (b), however, prohibits the witness from being "prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled to testify or produce evidence, and no testimony or evidence so compelled, and no evidence discovered as a result of or otherwise derived from testimony or evidence so compelled, may be used as evidence against him in any proceeding, except that no witness shall be immune from prosecution for perjury or contempt committed while giving such testimony or producing such evidence."

[15] Contrary to the state's argument, the defendant does not contend that the witnesses were entitled to additional immunity for subject matter not covered by the preexisting immunity. For this reason, we do not need to determine whether the defendant had a constitutional or statutory right to have these witnesses granted *additional* immunity.

[16] Even if we assume that immunity extends throughout the entire trial, this in no way means that the statute permits an immunized witness to testify falsely; the statute specifically prohibits the state from granting immunity for perjury a witness commits while giving testimony under a grant of immunity. See General Statutes § 54-47a (b); see also *State* v. *Giraud*, 258 Conn. 631, 634, 783 A.2d 1019 (2001) (immunity is not "a license to lie" [internal quotation marks omitted]). The defendant does not argue otherwise.

State *v.* Collymore

be revoked during the defense case-in-chief, and that
the state's failure to extend the immunity violated § 54-
47a,[17] we determine that this violation was not constitu-
tional in nature.

The defendant argues that this alleged error is of
constitutional magnitude and that, by mischaracterizing

_____

[17] We note that, although the defendant argues before this court that the
trial court failed to rule on the issue of whether the statute provided the
witnesses with immunity throughout the entirety of the trial, the defendant
never requested that the trial court decide this issue. Although the defendant
argued at trial that the state's actions violated his rights to present a defense
and to due process because the state was unfairly depriving him of witness
testimony by scaring the witnesses from the witness stand, he did not
argue that the state violated the statute. Defense counsel even admitted
that whether immunity was granted was solely in the hands of the state
and not within the power of the court. Defense counsel did not take issue
with the state's argument that, under the statute, immunity extended only
to the witnesses' testimony during the state's case. When the trial court
inquired what defense counsel was seeking from the court on this issue,
defense counsel responded that he did not think the court could do anything
about whether the witnesses' immunity extended to the defense case-in-
chief but requested that the jury be instructed that the state had revoked
immunity, which the trial court denied. Although the trial court stated that
it was unclear whether immunity extended to the defense case-in-chief, it
did not fail to decide this issue because the defendant never sought a ruling
on this issue.

Because the defendant did not raise a statutory claim at trial that the
state improperly applied § 54-47a by revoking immunity, to the extent that
the defendant's claim is not constitutional in nature, we do not review his
statutory claim for harmless error, even if we assume that the state's actions
violated § 54-47a. See *Crawford* v. *Commissioner of Correction*, 294 Conn.
165, 203, 982 A.2d 620 (2009) ("we will not review a claim unless it was
distinctly raised at trial"); *Eubanks* v. *Commissioner of Correction*, 329
Conn. 584, 597, 188 A.3d 702 (2018) (same).

Despite the defendant's failure to raise this statutory claim at trial, to the
extent that his constitutional claim relies on a violation of § 54-47a, we do
not find it unpreserved. At trial, the defendant claimed that the state's actions
regarding immunity violated his constitutional rights. The fact that the defen-
dant now argues that the state's actions likewise violated § 54-47a does not
make his constitutional claim unpreserved, nor does the state so argue.
The defendant's argument on appeal—that the state's actions violated his
constitutional rights to due process and to present a defense because the
state employed tactical gamesmanship to scare the witnesses from the
witness stand and, thus, unfairly deprived him of their testimony—is the
same as his argument before the trial court, regardless of the reference to
§ 54-47a. See, e.g., *Crawford* v. *Commissioner of Correction*, supra, 294
Conn. 203 ("[w]e may . . . review legal arguments that differ from those
raised before the trial court if they are subsumed within or intertwined with
arguments related to the legal claim raised at trial").

State *v.* Collymore

the state's actions as declining to grant additional immunity rather than as revoking or failing to extend immunity, the Appellate Court did not properly address his constitutional claim. Specifically, the defendant argues that, by mischaracterizing the actions of the state, the Appellate Court never addressed (1) his allegation that the state acted with the intent to deprive him of the witnesses' testimony by revoking immunity in violation of § 54-47a, and (2) the impact that the revocation, coupled with the trial court's warnings, had on the witnesses and their decisions to invoke their fifth amendment rights against self-incrimination.

1

First, the defendant contends that the Appellate Court did not address his argument that due process and compulsory process under the federal constitution required that immunity be extended to the defense case-in-chief because the state intentionally prevented the witnesses from testifying in the defense case-in-chief. Even if we assume that the state's actions violated § 54-47a, this court has explained that only under "certain compelling circumstances" have some federal courts determined that "the rights to due process and compulsory process under the federal constitution require the granting of immunity to a defense witness." *State* v. *Holmes*, supra, 257 Conn. 254; accord *State* v. *Kirby*, supra, 280 Conn. 403–404. Specifically, "[t]he federal [c]ircuit [c]ourts . . . have developed two theories pursuant to which the due process and compulsory process clauses entitle defense witnesses to a grant of immunity. They are the effective defense theory, and the prosecutorial misconduct theory. . . . Because such circumstances [have not been present in prior cases before this court], however, we [have not had to] decide whether either theory is a correct application of the due process or compulsory process clause." (Internal quotation marks omitted.) *State* v. *Kirby*,

State *v.* Collymore

supra, 404; see *State* v. *Giraud*, 258 Conn. 631, 636–37, 783 A.2d 1019 (2001) (applying this framework when state granted prosecution witness immunity during hearing in probable cause but refused to extend immunity to defendant's case-in-chief when same witness was called as defense witness during trial).

The defendant in this case argues that only the prosecutorial misconduct theory applies.[18] "The prosecutorial misconduct theory of immunity is based on the notion that the due process clause [constrains] the prosecutor to a certain extent in [the] decision to grant or not to grant immunity. . . . Under this theory, however, the constraint imposed by the due process clause is operative only when the prosecution engages in certain types of misconduct, which include forcing the witness to invoke the fifth amendment or engaging in discriminatory grants of immunity to gain a tactical advantage, and the testimony must be material, exculpa-

---

[18] This framework has been used predominantly for evaluating whether the state's refusal to grant immunity to a defense witness, who never has been granted immunity, violated the defendant's constitutional rights. See *State* v. *Kirby*, supra, 280 Conn. 402–404. It also has been applied by this court to determine whether the state violated a defendant's constitutional rights when it granted a witness immunity at one stage of the proceedings (the hearing in probable cause) but declined to extend that immunity to the same witness when called as a defense witness during trial. *State* v. *Giraud*, supra, 258 Conn. 635–37. The parties do not dispute that this framework applies under the procedural posture and facts of this case; in fact, the defendant relies on it in support of his constitutional claim. Although we have been unable to identify any federal cases in which this framework has been applied when immunity has been revoked, rather than when the state has declined to grant immunity, this framework appears to be equally applicable to the constitutional analysis in the present case because it considers whether the state engaged in a discriminatory grant of immunity, which is how the defendant in the present case categorizes the state's actions—discriminatorily granting immunity for the state's case but revoking that immunity during the defendant's case to gain a tactical advantage.

Additionally, we note that, although the nomenclature of the prosecutorial misconduct theory is similar to a claim for prosecutorial impropriety, these are two separate and distinct claims, and the defendant in the present case does not raise a prosecutorial impropriety claim.

State *v.* Collymore

tory and not cumulative, and the defendant must have no other source to get the evidence.'' (Internal quotation marks omitted.) *State* v. *Kirby*, supra, 280 Conn. 404. As in *Kirby*, we need not decide whether the prosecutorial misconduct theory is valid, because, even if we did, the defendant has failed to establish that he has satisfied the requirements of this theory in this case.

We have described the requirements of this theory as ''a very difficult burden for a defendant to meet.'' *State* v. *Giraud*, supra, 258 Conn. 637. Specifically, the defendant has the burden of establishing that (1) the prosecution engaged in misconduct, (2) the testimony was material, exculpatory, and not cumulative, and (3) there was no other source for securing the evidence. In the present case, the defendant did not request that the trial court make a finding regarding (a) whether the state engaged in misconduct, or (b) the state's intent in revoking immunity. From the record, it appears that the state's actions were based on its interpretation of the statute, not an intent to deprive the defendant of witness testimony. Nevertheless, there is at least the appearance of unfairness in the state's actions, especially in light of the fact that a defendant has the right to recall prosecution witnesses in his or her own case-in-chief to inquire into matters beyond the scope of the state's direct examination. See *State* v. *Caracoglia*, 134 Conn. App. 175, 192, 38 A.3d 226 (2012) (''[T]he scope of the state's direct examination inherently limits the scope of the defendant's cross-examination. It occasionally may be necessary for the defendant to go beyond the scope of direct examination to present information material to his defense. To do so he may need to recall a witness.''). Specifically, to the extent that the defendant intended to ask these witnesses questions that involved subjects covered by the existing immunity but that went beyond the scope of the state's direct examination, it would appear unfair for the defen-

State *v.* Collymore

dant to be denied the opportunity to ask these questions because the state revoked immunity. We caution the state against engaging in what would appear to be an unfair and discriminatory grant of immunity. Even if we assume, however, that the state's actions were unfair and constituted misconduct by engaging in a discriminatory grant of immunity to gain a tactical advantage, the defendant has failed to establish that the testimony he was prevented from offering was not cumulative.

The defendant argues that the state's improper revocation of immunity, which caused the witnesses to improperly invoke their fifth amendment right against self-incrimination, deprived him of exculpatory, material, and noncumulative testimony. Specifically, he argues that the testimony of Bugg, Vance, and Oliphant during the defense case would have provided additional details about the defendant's and the witnesses' roles in the attempted robbery and murder, and would have rehabilitated the witnesses' and the defendant's credibility. We disagree.

a

The defendant's argument is premised on his subsidiary argument that, if immunity had not been revoked, the witnesses would not have been able to validly invoke their fifth amendment rights against self-incrimination. Thus, to determine whether the testimony at issue was exculpatory, material, and noncumulative, we first must determine whether the witnesses could have validly invoked their fifth amendment rights, even if immunity had not been revoked. We are guided by the following legal principles: "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. . . . In appraising a

State *v.* Collymore

fifth amendment claim by a witness, a judge must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'' (Citations omitted; internal quotation marks omitted.) *Martin* v. *Flanagan*, 259 Conn. 487, 495–96, 789 A.2d 979 (2002).

When a witness' invocation of the fifth amendment privilege against self-incrimination conflicts with a defendant's right to present a defense, the defendant's right must ''bow to accommodate other legitimate interests in the criminal trial process.'' (Internal quotation marks omitted.) *Rock* v. *Arkansas*, 483 U.S. 44, 55, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). ''The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'' *Taylor* v. *Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). However, a witness' testimony is not privileged under the fifth amendment right against self-incrimination if the testimony is protected by a grant of immunity. See *State* v. *Roma*, 199 Conn. 110, 115, 505 A.2d 717 (1986); id., 115–16 (holding that witness validly invoked fifth amendment right when questioned about subject matter that was outside scope of immunity and outside scope of prior testimony). Additionally, once a witness voluntarily has testified about a subject, he may not later invoke the privilege against self-incrimination when questioned about additional details involving that subject matter. See id., 115 (''[w]here the witness . . . has already testified, on direct examination, to the incriminating matters sought to be explored on cross, he may be found to have waived his right not to disclose further the relevant details necessary to test the truth or accuracy of what he has already revealed'').

With regard to the testimony of Bugg, Vance, and Oliphant, even if we assume that the state violated § 54-47a by revoking immunity and that immunity should

State *v.* Collymore

have extended to the defense case-in-chief, the three witnesses validly invoked their fifth amendment rights in response to some, though not all, of the questions posed on direct examination during the defendant's case. Bugg answered many of the questions asked by defense counsel on direct examination during the defense case-in-chief. After testifying that he did not have a good relationship with Foote at the time of the murder because Foote had stolen from him, Bugg invoked his fifth amendment right in response to a question about what Foote had stolen from him. Bugg also invoked his fifth amendment right in response to questions about precisely where the getaway vehicle he was driving was located at the time the shooting occurred.[19]

As to the question about what Foote stole from Bugg, Bugg and his counsel believed that whatever Foote stole could possibly subject Bugg to criminal charges. Even if we assume that what was stolen involved some form of contraband, Bugg's preexisting immunity, which covered only drug activity on the day of the murder,[20] would

---

[19] The defendant also argues that Bugg refused to respond to questions about a telephone conversation with his sister involving "kitty." Our review of the record, however, shows that Bugg did respond to defense counsel's inquiries about that subject during direct examination in the defense case. See also footnote 10 of this opinion. The defendant has not identified any questions that he was unable to ask or any new information that he was unable to obtain regarding this subject matter.

[20] The immunity that the state had granted to Bugg was limited to drug activity that he was engaged in on the day of the murder. See part I A of this opinion. Although the state indicated that it did not intend to prosecute Bugg for making a false statement at the hearing in probable cause, no immunity was officially granted. See id.; see also *State* v. *Williams*, 200 Conn. 310, 319, 511 A.2d 1000 (1986) ("the right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the possibility of prosecution"); *Murphy* v. *Nykaza*, Superior Court, judicial district of Fairfield, Docket No. 320696 (May 17, 1995) (14 Conn. L. Rptr. 289, 290) ("a prosecuting attorney's indication in a particular case that he will not prosecute . . . [is] not sufficient to defeat a claim of privilege" [internal quotation marks omitted]).

State *v.* Collymore

not have extended to his response to this question, even if the immunity had not been revoked. Thus, Bugg validly invoked his fifth amendment privilege in response to this question, regardless of the revocation of immunity.

As to the questions regarding the location of the getaway vehicle, to the extent that the location of the vehicle might implicate Bugg in drug activity on the day of the murder—as Bugg was the getaway driver in what he claimed began as a narcotics deal—under the broad standard that applies, the grant of immunity covered these questions. See *Martin* v. *Flanagan*, supra, 259 Conn. 495 (invocation of fifth amendment right is valid if there *might* be danger of injurious disclosure). Therefore, if immunity had not been revoked, Bugg's invocation of his fifth amendment privilege in response to these questions would have been invalid.

Vance, who was granted immunity from prosecution only for making a false statement to the police and during his plea proceedings, invoked his fifth amendment right against self-incrimination during the defense case-in-chief as to the following questions: (1) did he shoot the victim, (2) what promises did the police officers make to him at the time he signed his statement, (3) what did the detectives tell him about signing the statement, and (4) did he make a telephone call to Atkins in June, 2012?

The grant of immunity would have covered Vance's response to the first question if his response established that he lied in his statement to the police or during the plea proceedings about shooting the victim. Thus, his invocation of his fifth amendment privilege in response to that question would have been invalid if immunity had not been revoked.

Additionally, the grant of immunity would have covered Vance's responses to the second and third ques-

State *v.* Collymore

tions if they had established that he was coerced into signing his statement to the police and that the information it contained was false, and, thus, that he had made a false statement. Therefore, his invocation of his fifth amendment privilege in response to those questions would have been invalid if immunity had not been revoked.

Vance's response to the fourth question would have been outside the scope of the immunity he was granted because it did not involve his prior statements, which did not mention Atkins, and, thus, the revocation of immunity had no effect on his invocation of his fifth amendment privilege as to this question. Additionally, Vance never testified about a telephone call to Atkins during the state's case and, thus, did not waive his fifth amendment right as to that question. Moreover, the record is void of information regarding Atkins, for example, who she is and the importance of this telephone call, and, thus, it is unclear how Vance's response to this question would have tended to incriminate him. Because it is the defendant's burden to establish harm; see, e.g., *State* v. *Bouknight*, 323 Conn. 620, 626–27, 149 A.3d 975 (2016); we cannot conclude that Vance would have invalidly invoked his fifth amendment right if immunity had not been revoked.

Oliphant, who was granted immunity from prosecution for filing a false statement and hindering prosecution on the basis of his statement to the police, invoked his fifth amendment right when he was examined[21] by the defendant in his case-in-chief in response to questions about (1) whether he had been beaten while in police custody and (2) whether he previously had testi-

--------

[21] The defendant does not argue that he was harmed by Oliphant's invocation of his fifth amendment right in response to questions by the state during cross-examination in the defense case about a man named Jamel, with whom the defendant was arrested and who testified about hearing him being beaten by detectives while in police custody.

State *v.* Collymore

fied in the state's case that he felt guilty about Vance.[22]
The grant of immunity would have covered Oliphant's
response to the first question if it established that he
was coerced into making and signing a false statement
to the police and, thus, had made a false statement.
Therefore, the invocation of his fifth amendment privi-
lege in response to that question would have been
invalid if immunity had not been revoked. Similarly,
the grant of immunity would have covered Oliphant's
response to the second question if it established that
he felt guilty because he lied about what occurred on
the night of the murder and, thus, had made a false
statement in his statement to the police. Therefore, his
invocation of his fifth amendment privilege in response
to that question would have been invalid if immunity
had not been revoked.

b

To the extent that these witnesses validly invoked
their fifth amendment privilege, even if immunity had
not been revoked, the defendant has failed to establish
that the revocation of immunity violated his constitu-
tional rights under the prosecutorial misconduct theory
because the witnesses would not have answered these
questions anyway, and, thus, their testimony would
not have been exculpatory. To the extent the witnesses
could have invalidly invoked their fifth amendment
right if the immunity had not been revoked, however,
we must determine whether the invalid invocations

_____

[22] Our review of the record does not show that Oliphant testified that he
felt guilty about Vance. Oliphant testified that, when Vance had been living
in North Carolina, he called Oliphant and said he was staying in an abandoned
house, and so Oliphant "felt bad" for him and invited Vance to stay with
him in Connecticut. Oliphant, however, did testify on direct examination in
the state's case-in-chief that he felt "a lot of guilt" about this case. On cross-
examination, defense counsel inquired into this subject, in response to which
Oliphant testified that he felt guilty for lying and incriminating the defendant,
his best friend, by signing a false statement, which he signed only because
the detectives beat and coerced him.

State *v.* Collymore

deprived the defendant of material, exculpatory, and noncumulative testimony. We determine that they did not because the defendant has failed to establish that the testimony would not have been cumulative.

To summarize, Bugg invalidly invoked his fifth amendment right in regard to questions about the location of the getaway vehicle that he operated at the time of the shooting. Vance invalidly invoked his fifth amendment right in regard to questions about whether he shot the victim, what promises the detectives made to him when he signed his statement to the police, and what the detectives told him about signing the statement. Oliphant invalidly invoked his fifth amendment right in regard to questions about whether he was beaten while in police custody and whether he previously testified in the state's case about feeling guilty about Vance. The defendant argues that the proposed inquiries addressed noncumulative, exculpatory, and material information about the events at issue and would have rehabilitated his credibility and that of the witnesses.[23] Specifically, he argues that where Bugg moved and parked the getaway vehicle would have helped establish both what Bugg witnessed and whether any of the other witnesses, such as, for example, the

_____

[23] The defendant argues that the harm caused by the exclusion of this testimony was compounded by the state's reliance on the unavailable testimony in its summation to the jury. See *State* v. *Carter*, 228 Conn. 412, 428–29, 636 A.2d 821 (1994), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990); id., 428 ("the harm to the defendant's claim of self-defense resulting from the exclusion of the victim's criminal record was compounded when the assistant state's attorney, in his rebuttal to the defendant's closing argument, commented" that there was no evidence that victim was bad person).

Although we agree that a defendant may be harmed by the improper exclusion of evidence if the prosecutor, in summation to the jury, relies on the significance of the missing evidence, this is not such a case. After having thoroughly reviewed the record, we determine that the state did not rely on the absence of the improperly excluded testimony during its summation.

334 Conn. 431 JANUARY, 2020 465

State *v.* Collymore

victim's mother and brother,[24] were able to see the getaway vehicle. Additionally, the defendant argues that the location of the getaway vehicle would cast doubt on the credibility of Foote's testimony that Bugg had told him that he witnessed the shooting.[25]

Although we agree that this information would be material, we disagree that the defendant has established that it was not cumulative. During the state's case, both the defendant and the state questioned Bugg about the location of the getaway vehicle before, during, and after the shooting. Although Bugg's prior testimony, which mentioned the location and movements of the getaway vehicle, was not read into the record for substantive purposes until after Bugg testified in the state's case, the state questioned Bugg about his prior testimony, going through it sentence by sentence. Then, on cross-examination, defense counsel both had the opportunity to, and did, in fact question Bugg about his prior testimony, including the location of the getaway vehicle and his motives for providing the prior testimony. The defendant has failed to identify any testimony Bugg would have provided on this subject that he did not already provide in the state's case[26] and therefore has

[24] Both the victim's mother, Nelly Robinson, and brother, George C. Frazier, testified at the criminal trial that they saw a white getaway vehicle from the front door of their apartment, which conflicted with Bugg's testimony about parking the vehicle behind and between two of the apartment buildings. See part II A of this opinion.

[25] Foote testified at trial that Bugg informed him that he had witnessed the shooting. The defendant argues that, because Foote testified after Bugg, he should have been permitted to question Bugg about whether he witnessed the shooting. The defendant, however, never asked Bugg during direct examination in the defense case-in-chief whether he witnessed the shooting, and, thus, Bugg never invoked his fifth amendment privilege in response to this question. In the absence of such a record, we cannot say that the defendant was harmed.

[26] The defendant argues that the Appellate Court speculated that the witnesses' testimony during the defense case would have been cumulative but that there is no way to know or for him to have created a sufficient record because the state prevented him from obtaining answers to these questions. The case cited by the defendant, however, is distinguishable because it

State *v.* Collymore

provided us with no reason to believe that any further testimony by Bugg on this subject would not have been cumulative.

The defendant also argues that Vance would have provided material testimony because identifying who shot the victim and from where the gunshots originated were central issues at trial. Additionally, he argues that asking Vance about what the detectives said to him and promised him in regard to his statement to the police was crucial to rehabilitating his credibility by establishing that he had been coerced into signing the statement. Again, we agree that this information was material, but we also determine that the defendant has failed to establish that it was not cumulative. During the state's case, both parties questioned Vance at length about his role in the murder. In all of his different statements and varying testimony, Vance admitted that he fired his weapon on the night of the murder at the scene of the crime and may have (accidentally or otherwise) shot the victim. The defendant, who has the burden of establishing that he has satisfied all three prongs of the prosecutorial misconduct theory, has provided no record to establish that, had Vance once again been questioned

involved an error of constitutional magnitude, thereby requiring the state to prove that the error was harmless beyond a reasonable doubt, which it could not do in the absence of a sufficient record. See *State* v. *D'Ambrosio*, 212 Conn. 50, 61, 561 A.2d 422 (1989) (''[o]n the present record, we cannot conclude that the court's error, which implicates the defendant's constitutional right to impeach and discredit state witnesses, was harmless beyond a reasonable doubt''), overruled in part on other grounds by *State* v. *Bruno*, 236 Conn. 514, 523–24 n.11, 673 A.2d 1117 (1996).

In the present case, under the prosecutorial misconduct theory, the burden is on the defendant to provide a sufficient record and to establish that the testimony would not have been cumulative. The trial court advised defense counsel to ask any questions he had and to create an adequate record. In light of the fact that the witnesses invalidly invoked their fifth amendment rights in response to questions that they already had answered in the state's case, there is no reason in the record to suspect that any additional testimony would have been any different from their prior testimony.

State *v.* Collymore

about who shot the victim, his testimony would have provided any new information.

Similarly, both parties questioned Vance at length about his allegations of police coercion. Defense counsel spent significant time on cross-examination in the state's case attempting to rehabilitate Vance's credibility by establishing that the detectives coerced him into signing the statement that he gave to them. Although it is true that Vance's prior testimony at his plea proceedings was not read into the record for substantive purposes until after his testimony in the state's case concluded, Vance had been questioned by both parties about his prior testimony during the state's case, and, thus, defense counsel already had attempted to rehabilitate Vance's credibility in regard to his prior testimony. Moreover, the defendant has failed to identify any new and nonprivileged testimony that Vance would have provided on these subjects that he had not already provided in the state's case. As a result, the defendant has failed to establish that any further testimony by Vance on these subject matters would not have been cumulative.[27]

The defendant similarly argues that Oliphant's testimony would have been material and exculpatory because whether Oliphant was beaten while in police custody and whether he felt guilty about Vance were matters that pertained to Oliphant's credibility. The record establishes, however, that Oliphant testified about these subject matters in the state's case. See foot-

---

[27] Because we have determined that, even if the state improperly revoked immunity, and the witnesses subsequently invalidly invoked their fifth amendment rights, the defendant has failed to establish that this error was constitutional under the prosecutorial misconduct theory on the ground that he has failed to establish that the testimony would not have been cumulative, we need not address the state's alternative argument that any error in the revocation of immunity as to Vance was harmless because the statute of limitations for the crime of making a false statement had expired. See *State* v. *Giraud*, supra, 258 Conn. 638.

State *v.* Collymore

notes 7 and 22 of this opinion. Defense counsel spent considerable time on cross-examination attempting to rehabilitate Oliphant's credibility by establishing that he had signed the statement he made to the police after they had beaten and coerced him and that he felt guilty for having lied about the defendant's role in the murder. The defendant has not identified any new testimony that Oliphant would have provided on these subjects. Thus, the defendant has failed to establish that Oliphant's testimony would not have been cumulative.

The defendant further argues, generally, that, because other witnesses testified on behalf of the state after these witnesses and because Vance's prior testimony in his plea proceedings and Bugg's prior testimony at the hearing in probable cause were read into the record after their testimony had concluded, he should have had an opportunity to confront these witnesses about these subsequent pieces of evidence, which would not have been cumulative. The defendant argues that by not having this opportunity, he was restricted to remain within the parameters of the state's case and denied the right to compose his defense strategy as he thought best. He argues that he had compelling tactical reasons to wait to ask certain questions until the defense case, after all of the state's witnesses had testified.

We agree that, in general, a defendant is not limited to the scope of the state's case and may recall a state's witness as a defense witness to inquire into areas not previously discussed in the state's case.[28] See *State* v. *Caracoglia*, supra, 134 Conn. App. 192–93. However, with the exception of the question about what Foote stole from Bugg, to which Bugg had a valid claim of

---

[28] Both the trial court and the state correctly stated that the defendant had the right to recall the state's witnesses during the defense case-in-chief and question them on new topic areas not raised during the state's case.

State *v.* Collymore

privilege, the defendant has failed to provide a record of what other evidence he wanted to confront the witnesses about that he did not already ask about in the state's case. Although Bugg's prior testimony from the hearing in probable cause and Vance's prior testimony from his plea proceedings were admitted for substantive purposes after those witnesses testified in the state's case, both parties questioned Bugg and Vance extensively during the state's case about the substance of that testimony and their motives for providing that testimony. Despite inquiries by the trial court, the Appellate Court, and this court, the defendant has been unable to articulate either what questions he would have asked that would have led to new and not privileged information or a strategic reason for delaying asking certain questions. Thus, the defendant has failed to establish either that his defense strategy was improperly curtailed or that he was prevented from inquiring into subject areas outside the scope of the state's case that would have led to new and not cumulative testimony.

Accordingly, because the defendant has failed to provide this court with a record establishing what new information these witnesses would have provided if the state had not revoked their immunity, he has failed to establish that the state's violation of § 54-47a, assuming that a violation did occur, violated his constitutional rights to due process and compulsory process under the prosecutorial misconduct theory of immunity.

2

With regard to the defendant's second argument in support of his constitutional claim, the defendant contends that, by failing to categorize the state's actions as revoking immunity, the Appellate Court improperly failed to consider whether the revocation of immunity, coupled with the trial court's warnings to the witnesses,

State *v.* Collymore

substantially interfered with his right to present a
defense by intimidating the witnesses and driving them
from the witness stand. Although we agree with the
defendant that the Appellate Court did not address the
impact the revocation of immunity, coupled with the
trial court's warnings,[29] had on the witnesses and their
decisions to invoke their fifth amendment rights, we do
not agree that the impact was such that the defendant's
rights to due process and to present a defense were
violated.

Neither the trial court nor the prosecutor may intimi-
date a witness and drive him from the witness stand.
See, e.g., *Webb* v. *Texas*, 409 U.S. 95, 98, 93 S. Ct. 351,
34 L. Ed. 2d 330 (1972) ("judge's threatening remarks
. . . effectively drove that witness off the stand, and
thus deprived the petitioner of due process"); *United
States* v. *Williams*, 205 F.3d 23, 29 (2d Cir.) ("judicial
or prosecutorial intimidation that dissuades a potential
defense witness from testifying for the defense can,
under certain circumstances, violate the defendant's
right to present a defense"), cert. denied, 531 U.S. 885,
121 S. Ct. 203, 148 L. Ed. 2d 142 (2000). Nevertheless,
"[t]he function of the court in a criminal trial is to
conduct a fair and impartial proceeding. . . . When the
rights of those other than the parties are implicated,
[t]he trial judge has the responsibility for safeguarding
both the rights of the accused and the interests of the
public in the administration of criminal justice. . . .

---

[29] We note that the defendant did not object to the court's admonitions
to the witnesses. However, because the record is adequate for review and
the defendant's claim is of constitutional magnitude, we review it pursuant
to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified
by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third
condition of *Golding*); see *State* v. *Fred C.*, 167 Conn. App. 600, 609, 142
A.3d 1258 (reviewing under *Golding* unpreserved claim that trial court's
perjury admonition to witness violated defendant's due process rights), cert.
denied, 323 Conn. 921, 150 A.3d 1150 (2016); see also *State* v. *Elson*, 311 Conn.
726, 754–55, 91 A.3d 862 (2014) (defendant was not required to affirmatively
request review under *Golding*).

State *v.* Collymore

Accordingly, it is within the court's discretion to warn a witness about the possibility of incriminating himself. . . . The court, however, abuses its discretion if it actively interferes in the defendant's presentation of his defense, and thereby pressures a witness into remaining silent. . . . The dispositive question in each case is whether the government actor's interference with a [witness'] decision to testify was substantial.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Tilus*, 157 Conn. App. 453, 475–76, 117 A.3d 920 (2015), appeal dismissed, 323 Conn. 784, 151 A.3d 382 (2016).

The present case is distinguishable from the cases cited by the defendant in which warnings issued by courts or prosecutors have been held to be coercive. In those cases, the government actor gratuitously and threateningly warned the witness about committing perjury, threatened to revoke a plea agreement, or made the witnesses physically unavailable. See, e.g., *Webb* v. *Texas*, supra, 409 U.S. 97 (''The trial judge gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury. . . . [And] the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury . . . .''); *United States* v. *Vavages*, 151 F.3d 1185, 1190–91 (9th Cir. 1998) (prosecutor substantially interfered with witness' decision whether to testify when warnings about committing perjury were intimidating and intended to stifle witness' testimony where prosecutor made ''an unambiguous statement of his belief that [witness] would be lying if she testified in support of [defendant's] alibi'' and threatened to withdraw witness' plea agreement in unrelated case if she testified in support of defendant's alibi [emphasis omitted]); *United States* v. *Morrison*, 535 F.2d 223, 225–26, 227 (3d Cir. 1976) (during meeting in his office on day before witness testified, prosecutor repeatedly warned witness about committing perjury, ''which culminated in a highly intimidating personal

State *v.* Collymore

interview''); *United States* v. *Bell*, 506 F.2d 207, 222
(D.C. Cir. 1974) (''[g]overnment conditioned its accep-
tance of [witnesses' guilty] pleas upon their commit-
ment to refrain from testifying [in defendant's] behalf'');
*United States* v. *Tsutagawa*, 500 F.2d 420, 422, 423 (9th
Cir. 1974) (''the government placed witnesses, who may
have been favorable to the appellees, outside the power
of our courts to require attendance'' when it precluded
appellees from interviewing them by releasing them
and sending them back to Mexico because they were
illegal aliens who were not subjects of grand jury inves-
tigation); see also *State* v. *Tilus*, supra, 157 Conn. App.
476 (courts have found interference when government
actor either stepped into role of witness' advocate or
specifically threatened witness).

In the present case, neither the trial court nor the
prosecutor threatened the witnesses. The witnesses
were not bombarded with multiple warnings, were not
warned that testifying in favor of the defendant would
lead to perjury charges, were not threatened with hav-
ing their plea deals revoked, and were not made physi-
cally unavailable. Although ''the court may not threaten
a witness into remaining silent or effectively [drive]
that witness off the stand''; (internal quotation marks
omitted) *State* v. *Fred C.*, 167 Conn. App. 600, 613, 142
A.3d 1258, cert. denied, 323 Conn. 921, 150 A.3d 1150
(2016); a court may advise a witness who has testified
inconsistently of the consequences of committing per-
jury, as long as the court does not suggest which version
of the witness' testimony is correct. Id., 613–14. Here,
the court cautioned the witnesses that the law was
unsettled as to whether they had immunity[30] and that

_____

[30] The defendant further argues that his rights to due process and to
present a defense were violated by the trial court's failure to decide whether
§ 54-47a required the state to extend immunity throughout the trial proceed-
ings. The defendant, however, never requested that the trial court determine
whether the statute provided the witnesses immunity throughout the entire
trial and not merely during the state's case-in-chief. See footnote 17 of
this opinion.

State *v.* Collymore

they should follow the advice of counsel as to whether they should testify. The court did not threaten the witnesses in any way. Although the state did inform the witnesses that it was revoking immunity and that none of their testimony during the defense case would be covered by any immunity, the record does not reflect that it did so in a threatening manner. Rather, it informed the court and witnesses of how it interpreted the immunity statute. The state never threatened the witnesses that, in light of this revocation of immunity, it would prosecute the witnesses if they testified or if they testified in a manner unfavorable to the state's case. The state's actions might have been a factor in the witnesses' decisions to invoke their fifth amendment rights, but ''[a] defendant's constitutional rights are implicated only where the prosecutor or trial judge employs *coercive or intimidating* language or tactics that *substantially interfere* with a defense witness' decision whether to testify.'' (Emphasis added.) *United States* v. *Vavages*, supra, 151 F.3d 1189. The state's informing the witnesses of what it believed to be the scope of the immunity statute was not so coercive or intimidating as to substantially interfere with the witnesses' decisions.

Moreover, Bugg, Vance, and Oliphant all were represented by counsel and had an opportunity to speak with their counsel regarding their decisions to invoke their fifth amendment rights. See *United States* v. *Serrano*, 406 F.3d 1208, 1216 (10th Cir.) (''potential for unconstitutional coercion by a government actor significantly diminishes . . . if a defendant's witness elects not to testify after consulting an independent attorney'' [emphasis omitted]), cert. denied, 546 U.S. 913, 126 S. Ct. 277, 163 L. Ed. 2d 247 (2005); *State* v. *Tilus*, supra, 157 Conn. App. 477 (same).

Thus, the revocation of immunity, coupled with the trial court's warnings to the witnesses, did not drive these witnesses from the witness stand and, thus, did

State *v.* Collymore

not violate the defendant's rights to due process and to present a defense. Accordingly, even if we assume that the state violated § 54-47a by revoking the immunity it previously granted to Bugg, Vance, and Oliphant, this error was not constitutional in nature. Thus, the defendant has failed to establish that, by revoking this immunity, the state violated his constitutional rights.

II

The defendant next claims that, pursuant to this court's recent decision in *State* v. *Dickson*, supra, 322 Conn. 410, his right to due process was violated by the first time in-court identification[31] testimony of the victim's mother, Nelly Robinson, and brother, George C. Frazier. As to Robinson, the defendant argues that, because she did not previously inform anyone that she had witnessed the shooting or that she could describe the shooters, her description of the shooters constituted a first time in-court identification subject to *Dickson*. As to George Frazier, the defendant argues that, because he did not previously identify the defendant in an out-of-court, nonsuggestive identification procedure, his in-court identification violated *Dickson*. The defendant further argues that both identifications were not harmless beyond a reasonable doubt.

The state responds that *Dickson* does not apply because identity was not at issue in the present case. Additionally, the state contends that, as to Robinson, *Dickson* does not apply because her description of the shooters did not constitute an identification. As to George Frazier, the state argues that *Dickson* does not apply because his in-court identification of the defendant was unsolicited and unanticipated, and *Dickson* applies only in cases in which "the state intends to present a first time in-court identification . . . ." Id.,

---

[31] For purposes of this opinion, "first time in-court identification" refers to in-court identifications in cases in which the witness has not successfully identified the defendant in a prior out-of-court identification procedure.

State *v.* Collymore

445. Finally, the state argues that, to the extent that
*Dickson* applies, the admission of the testimony was
harmless because of the state's strong case, which the
defendant's own testimony largely corroborated.

We agree with the state that, even if we assume that
Robinson and George Frazier made in-court identifi-
cations, identity was not at issue as to the charges of
attempted robbery, conspiracy to commit robbery, and
felony murder, and, thus, the admission of the first time
in-court identifications did not implicate the defen-
dant's right to due process. However, we disagree that
identity was not at issue in relation to the charge of
criminal possession of a firearm. Nevertheless, we
determine that any error was harmless beyond a reason-
able doubt.

A

The following additional facts are necessary to our
review of this claim. At trial, Robinson, the victim's
mother, testified that, at the time of the incident, she
was in her apartment on the second floor ironing cloth-
ing when she heard the victim yell and looked out the
window to see him running and ducking as two men
shot at him. She described the two shooters: "One was
taller than the other, and one was stockier and shorter
than the other one." She testified that the "short, stocky
one" fired two gunshots at the victim and that "the
other one" then fired two gunshots.[32] Robinson further
testified that she ran downstairs to the front door,

[32] On cross-examination, defense counsel, using a photograph of Diamond
Court, asked Robinson to use a pointer to show where on the photograph
the victim and the shooters were located when she looked out her window
and saw the shooting. In describing the events, Robinson testified that
the shooters chased after the victim but then stopped running and started
shooting. In describing where the shooters stopped, she testified: "This guy
right here—the short, fat one—went up, shot him twice, pushed back. The
other tall, skinny one went up, shot him twice . . . ."

The defendant does not argue on appeal that Robinson's use of the phrase,
"[t]his guy right here," meant that she was specifically pointing to and
identifying the defendant. Although the record is unclear, it is equally possi-

State *v.* Collymore

where her two other children were standing, with the door open. The victim was outside the door reaching toward her. She grabbed him and laid him on the ground. She looked around and saw the two shooters get into a white car that sped away. She testified that she told all of this to the police at the scene of the crime but admitted that, in her written statement to them, there is no reference to her having witnessed the shooting or having seen the shooters.[33]

Following Robinson's testimony, George Frazier— her son and the victim's brother—testified that, at the time of the incident, he was inside his family's apartment and heard yelling. He went to look out the downstairs window and saw the victim running and yelling for their mother. George Frazier testified that he went to open the front door and heard approximately five gunshots. He testified that, when he opened the front door, he saw the victim on the floor outside their apartment. He further testified that he heard gunshots coming from the direction of mailboxes on the premises and saw two shooters and a white, four door vehicle parked with three men inside. He testified that he did not previously inform the police that he saw two shooters and never identified the defendant as one of the shooters but recalled that the defendant was one of the two shooters "[b]ecause the man that stands in front of me, I recognize his face." He specified that he "saw [the defendant] with a gun" but "never told anybody

ble that Robinson's statement referred to where on the photograph she was pointing, as in, "this guy, the guy standing right here where I am pointing." The record does not reflect that she identified the defendant, and neither party has argued that she did.

[33] Officer Michael Modeen, who responded to the scene of the crime, testified that Robinson did not inform him that she had witnessed the shooting or seen the shooters but, rather, that she heard several loud bangs and then opened the front door to find the victim fall to his back and see a white car speed away with two or three males inside. Modeen, however, did testify that Robinson was overcome with emotion and that she had difficulty conveying this information.

State *v.* Collymore

that until now.'' He testified that the defendant was
with a ''short, light-skinned'' person.

George Frazier was subject to extensive cross-exami-
nation, during which he testified that he had suffered
from a brain tumor a few months after the victim's
murder and had difficulty recalling information. On
cross-examination, he testified inconsistently about
what he recalled, when and where he heard the gun-
shots, and what he had told the prosecutor. After his
testimony concluded, the prosecutor went on the
record, outside the presence of the jury, to state that
George Frazier had testified falsely as to when he had
met with her and that his testimony was unanticipated,
specifically, his testimony about witnessing the shoot-
ing and his identification of the defendant as one of the
shooters. Defense counsel said nothing on the matter.

B

''[W]hether [a party] was deprived of his due process
rights is a question of law, to which we grant plenary
review . . . .'' (Internal quotation marks omitted.)
*State* v. *Dickson*, supra, 322 Conn. 423. Whether the
admission of eyewitness identification testimony vio-
lated due process is premised on whether the identifica-
tion procedure was unnecessarily suggestive: ''In the
absence of unduly suggestive procedures conducted by
state actors, the potential unreliability of eyewitness
identification testimony ordinarily goes to the weight
of the evidence, not its admissibility, and is a question
for the jury. . . . Principles of due process require
exclusion of unreliable identification evidence that is
not the result of an unnecessarily suggestive procedure
[o]nly when [the] evidence is so extremely unfair that
its admission violates fundamental conceptions of jus-
tice . . . . A different standard applies when the defen-
dant contends that an in-court identification followed
an unduly suggestive pretrial identification procedure
that was conducted by a state actor. In such cases, both

State *v.* Collymore

the initial identification and the in-court identification
may be excluded if the improper procedure created a
substantial likelihood of misidentification.'' (Citations
omitted; internal quotation marks omitted.) Id., 419–20.

"In determining whether identification procedures
violate a defendant's due process rights, the required
inquiry is made on an ad hoc basis and is two-pronged:
first, it must be determined whether the identification
procedure was unnecessarily suggestive; and second,
if it is found to have been so, it must be determined
whether the identification was nevertheless reliable
based on examination of the totality of the circum-
stances.'' (Internal quotation marks omitted.) Id.,
420–21.

In *Dickson*, this court was faced with applying these
principles to a first time in-court identification. We rec-
ognized the suggestive nature of first time in-court iden-
tifications: "[W]e are hard-pressed to imagine how there
could be a more suggestive identification procedure
than placing a witness on the stand in open court, con-
fronting the witness with the person whom the state
has accused of committing [a] crime, and then asking
the witness if he can identify the person who committed
the crime. . . . If this procedure is not suggestive, then
no procedure is suggestive.'' (Emphasis omitted; foot-
note omitted.) Id., 423–24.

To avoid this kind of suggestive procedure, we
announced the following procedural rule: "[I]n cases
in which identity is an issue, in-court identifications
that are not preceded by a successful identification in
a nonsuggestive identification procedure implicate due
process principles and, therefore, must be prescreened
by the trial court.'' (Footnote omitted.) Id., 415. We then
established the following prescreening procedure: "In
cases in which there has been no pretrial identification
. . . and the state intends to present a first time in-court
identification, the state must first request permission

State *v.* Collymore

to do so from the trial court. . . . The trial court may grant such permission only if it determines that there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue.'' (Citation omitted.) Id., 445–46. Permission is proper in these kinds of cases because, ''when identity is not an issue,'' a defendant's due process rights are not implicated. Id., 433.

We held that this procedural rule applied retroactively to all cases pending on review. Id., 450–51. Because, however, it was too late to prescreen first time in-court identifications that already had occurred in pending cases, we provided a road map for how pending appeals should be handled: ''[I]n pending appeals involving this issue, the suggestive in-court identification has already occurred. Accordingly, if the reviewing court concludes that the admission of the identification was harmful, the only remedy that can be provided is a remand to the trial court for the purpose of evaluating the reliability and the admissibility of the in-court identification under the totality of the circumstances. . . . If the trial court concludes that the identification was sufficiently reliable, the trial court may reinstate the conviction, and no new trial would be required.'' (Citations omitted; emphasis omitted.) Id., 452. ''Of course, if the record is adequate for review of the reliability and admissibility of the in-court identification, the reviewing court may make this determination.'' Id., 452 n.35.

Since *Dickson*, this court has not been faced with the retroactive application of *Dickson* to a claim involving a first time in-court identification that already has occurred. The Appellate Court, however, has addressed this issue. Specifically, in *State* v. *Swilling*, 180 Conn. App. 624, 646, 184 A.3d 773, cert. denied, 328 Conn. 937, 184 A.3d 268 (2018), the defendant, who had a romantic history with the victim, was convicted of kidnapping, home invasion, and assault prior to this court's decision

State *v.* Collymore

in *Dickson*. Id., 627–28, 648. The victim, who did not make an out-of-court nonsuggestive identification, identified the defendant for the first time at trial as her assailant. Id., 647–48. On appeal to the Appellate Court, the defendant in *Swilling* claimed that, pursuant to *Dickson*, the victim's first time in-court identification violated his right to due process because the victim did not first make an out-of-court nonsuggestive identification and because the trial court did not prescreen the victim's in-court identification. Id., 648–49. The Appellate Court disagreed. Following this court's road map in *Dickson* for addressing this issue in pending cases, the Appellate Court determined that, because "there was no factual dispute with respect to whether the victim had the ability to identify the defendant"; id., 648; and, thus, identity was not at issue, there was no constitutional violation, and, therefore, the trial court's failure to prescreen the first time in-court identification was not harmful. Id., 649–50. Because the Appellate Court found the lack of prescreening harmless, it properly did not go on to determine whether the identification was reliable under the totality of the circumstances.

We agree with the Appellate Court's application of *Dickson* in *Swilling*. Because prescreening was not required in pending cases in which the first time in-court identification already occurred, a reviewing court must determine whether the admission was harmful, which necessarily includes determining whether identity was at issue. See *State* v. *Dickson*, supra, 322 Conn. 452. Thus, for cases pending at the time the decision in *Dickson* was released, if identity was not at issue, the admission of a first time in-court identification does not implicate due process concerns and, thus, was not harmful.[34]

_____

[34] The state argues that, when identity is not at issue, *Dickson* does not apply. We have classified the impact of the rule in *Dickson* a bit differently, however, but with the same result in this case. We have held that the procedural rule in *Dickson* applies to all first time in-court identifications. Under *Dickson*, prospectively, all first time in-court identifications must be

State *v.* Collymore

In the present case, the state argues that, under *Dickson*, the admission of the first time in-court identifications did not violate the defendant's rights to due process for three reasons: (1) Robinson did not make a first time in-court identification, (2) *Dickson* applies only when "the state intends to present a first time in-court identification," and (3) identity was not at issue. We address each in turn.

1

As an initial matter, we must determine whether Robinson and George Frazier made first time in-court identifications. It is clear that George Frazier identified the defendant, for the first time at trial, as one of the shooters. He testified that he never previously informed anyone that he witnessed the shooting or that the defendant was one of the shooters. It is less clear whether Robinson's testimony constitutes a first time in-court identification.

Robinson never testified at trial that the defendant was one of the two shooters. Nor did she testify that one of the victim's assailants looked like the defendant. Robinson did not mention the defendant in any way. She did, however, testify that she saw two shooters— one was tall and thin, the other was short and stocky. Although the defendant argues that this description matches the physical characteristics of the defendant and Vance, Robinson never testified to such a correlation. As such, it is not clear from the record that Robinson explicitly identified the defendant as one of the shooters. Rather, she provided a description of the suspects.

---

prescreened, with the trial court having discretion to permit the admission of these identifications in cases in which identity is not at issue. Similarly, in cases pending at the time of this court's decision in *Dickson*, the lack of prescreening is harmful only if identity was at issue. Thus, *Dickson* makes clear that first time in-court identifications implicate due process only if identity is at issue.

State *v.* Collymore

This court in *Dickson* emphasized that the new rule we announced therein did not apply to observations of the perpetrator, such as height, weight, sex, race, and age, so long as the prosecutor does not question the witness about whether the defendant resembles the perpetrator. *State* v. *Dickson*, supra, 322 Conn. 436–37, 447; cf. *State* v. *Bethea*, 187 Conn. App. 263, 278, 202 A.3d 429, cert. denied, 332 Conn. 904, 208 A.3d 1239 (2019); *State* v. *Torres*, 175 Conn. App. 138, 150, 167 A.3d 365, cert. denied, 327 Conn. 958, 172 A.3d 204 (2017).

Nevertheless, we noted in *Dickson* that a defendant's due process rights may be implicated by the admission of a witness' testimony as to their observations about a perpetrator if the witness "was unable to provide any of these details before the court proceeding . . . ." *State* v. *Dickson*, supra, 322 Conn. 437 n.19. However, because we were not presented with that problem in that case, we did not address it. See id.

The description that Robinson gave of the perpetrators was minimal and generic—a short, stocky man and a tall, thin man. Robinson did not testify as to race, age, clothing or facial descriptions. This court has not previously addressed whether the level of detail in a witness' description of a perpetrator plays a factor in whether the description constitutes an identification or implicates a defendant's due process rights. We, however, need not decide this issue because, even if we assume that the rule in *Dickson* applies to Robinson's observations about the perpetrators, the defendant suffered no harm. See part II C of this opinion.

2

Next we address the state's argument that *Dickson* does not apply in the present case because *Dickson* applies only when "the state intends to present a first time in-court identification . . . ." *State* v. *Dickson*, supra, 322 Conn. 445. It is true that the procedure we

State *v.* Collymore

set forth in *Dickson* did not contemplate cases in which the first time in-court identification was a surprise to both the state and the defendant. Although we recognize that the prosecutor in the present case committed no misconduct because the identifications were unsolicited and unanticipated and because this court had yet to announce the new rule created in *Dickson*, the fact that these identifications were unsolicited and unanticipated does not affect whether they violate the defendant's right to due process. All first time in-court identifications are subject to the rule in *Dickson*; see footnote 34 of this opinion; regardless of the prosecutor's intent.

3

Finally, the state argues that *Dickson* does not apply, or that there was no due process violation; see id.; because identity was not at issue. Specifically, the state argues that, because the defendant testified that he was present at the scene of the crime and because he did not have to be the shooter to be convicted of felony murder, the shooter's identity was not at issue. The defendant responds that identity was at issue because the identity of the shooter and whether there was more than one shooter were actively disputed at trial. In light of the defendant's testimony that he was present at the scene of the crime, we agree with the state that identity was not at issue as to most of the charges, which did not require the defendant to be the shooter in order to be found guilty but disagree that identity was not at issue with regard to the charge of criminal possession of a firearm.

The defendant was charged with and found guilty of felony murder, two counts of attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm. See footnote 1 of this opinion. Although the state's

State *v.* Collymore

general theory of the case was that the defendant and Vance attempted to rob the victim and then fired their guns at the victim, the state argued in summation to the jury that the defendant could be found guilty of attempted robbery even if he did not have or use a gun. The prosecutor stated that "it doesn't have to be that they both had guns; it has to be that either [the defendant] or [Vance] must have been armed." Similarly, in regard to the charge of felony murder, the prosecutor argued that the state "does not have to prove who shot and killed [the victim], just that either [Vance's or the defendant's] actions caused [the victim's] death."

Likewise, when instructing the jury as to the charge of felony murder, the trial court explained that, to find the defendant guilty, it had to find that "the defendant, acting alone or with one or more persons . . . committed or attempted to commit a robbery" and that "the defendant or another participant in the attempted robbery caused the death of [the victim] . . . ." As to the charge of attempted robbery under §§ 53a-49 (a) (2) and 53a-134 (a) (2), the trial court instructed the jury that, to find the defendant guilty, it had to find that "the defendant or another participant in the crime [was] armed with a deadly weapon." As to the charge of attempted robbery under §§ 53a-49 (a) (2) and 53a-134 (a) (4), the trial court instructed the jury that, to find the defendant guilty, it had to find that "the defendant or another participant in the crime [displayed] or [threatened] the use of what he [represented] by word or conduct to be a pistol, revolver, rifle, shotgun, machine gun, or other firearm." As to the charge of conspiracy to commit robbery, the trial court did not mention possession of a firearm in its instruction. The only charge on which the court instructed the jury that it had to find that the defendant possessed a firearm before it could find him guilty was the charge of criminal possession of a firearm in violation of § 53a-217 (a) (1).

State *v.* Collymore

The trial court's instructions were consistent with the law of this state. See *State* v. *Davis*, 255 Conn. 782, 791, 772 A.2d 559 (2001) ("treating accessories and principals alike" for purposes of § 53a-134 so that defendant does not have to possess, use, or threaten use of deadly weapon to be found guilty of robbery, as long as another participant in robbery possessed, used, or threatened use of deadly weapon).

As the state's argument and jury instructions make clear, identity was not at issue as to the charges of felony murder, both counts of attempted robbery, and conspiracy to commit robbery. As to those charges, although the identity of the shooter was disputed, the defendant did not need to possess or use a firearm to be found guilty. It was sufficient for the state to establish that the defendant participated in the attempted robbery and the conspiracy to commit robbery while another participant—Vance—possessed, used, or threatened the use of a firearm. The defendant placed himself at the crime scene at the time the crime occurred. He admitted at trial that he was standing near Vance when Vance fired his gun at the victim. In light of the defendant's testimony, the issues that remained as to these four charges concerned whether the defendant participated in the attempted robbery and the conspiracy to commit robbery. The identity of the shooter was not at issue. Thus, as to these four charges, because identity was not at issue, the admission of the identification testimony of Robinson and George Frazier did not implicate the defendant's due process rights and, therefore, was not harmful.

Identity was at issue, however, in relation to the charge of criminal possession of a firearm. For the jury to find the defendant guilty of this charge, the state was required to prove that he possessed a firearm. See General Statutes § 53a-217 (a) (1). Although the trial court noted in its jury instructions that possession could

State *v.* Collymore

be actual or constructive, the state in closing argument argued to the jury only that the defendant actually possessed a firearm. Cf. *State* v. *King*, 321 Conn. 135, 149, 136 A.3d 1210 (2016) ("[p]rinciples of due process do not allow the state, on appeal, to rely on a theory of the case that was never presented at trial"). Although the state was not required to establish that the defendant either was the shooter or possessed a firearm in order for the jury to find him guilty of felony murder, attempted robbery, and conspiracy to commit robbery, the state was required to establish that he actually possessed a firearm in order for the jury to find him guilty of criminal possession of a firearm. Thus, the identity of the shooter was at issue for purposes of that charge— if the state established that the defendant was the shooter, then it likewise established that he possessed a firearm. Accordingly, the identification testimony of Robinson and George Frazier did implicate the defendant's due process rights in relation to the charge of criminal possession of a firearm.

C

Because we have determined that the admission of the identification testimony of Robinson and George Frazier implicated the defendant's due process rights in relation to the charge of criminal possession of a firearm, we must determine whether the testimony was harmless beyond a reasonable doubt. See *State* v. *Dickson*, supra, 322 Conn. 453. "A constitutional error is harmless when it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible [evidence] . . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Citation omitted; internal quotation marks omitted.) Id. We conclude that any error was harmless beyond a reasonable doubt.

State *v.* Collymore

Whether an error is harmless in a particular case depends on several factors, including the importance of the witness' testimony to the state's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the witness' testimony on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *State* v. *Shaw*, 312 Conn. 85, 102, 90 A.3d 936 (2014). "Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) Id.

The following additional facts, some of which we already have discussed, are relevant to our analysis. Joseph Rainone, a firearms examiner for the Waterbury Police Department, testified that, on the basis of bullet fragments found at the scene of the crime, it was inconclusive whether all of the bullets had been fired from the same gun, and it was possible that either one or more firearms had been used. However, he testified that all of the bullets fired were .38 class bullets, which could be fired from either a .38 revolver or a .357 revolver. Additionally, he testified that at least five, but as many as seven, gunshots were fired. Thus, it was possible that all of the bullets could have been fired from Vance's .357 revolver or from both Vance's .357 revolver and another firearm (either a .357 or a .38 revolver).

There was conflicting testimony at trial concerning whether the defendant possessed and/or used a firearm during the incident. As detailed in part I A of this opinion, in the prior statements of Bugg and Vance that were admitted for substantive purposes under *Whelan*, both stated that the defendant had a .38 revolver in his possession at the time of the incident, although they

State *v.* Collymore

later recanted on the witness stand and testified that he did not have a gun. Additionally, in his statement to the police, which also was admitted for substantive purposes under *Whelan*, Oliphant stated that he knew that the defendant possessed a .38 revolver because he previously had seen the defendant with it, although not necessarily during the incident at issue. Oliphant disputed this knowledge during his testimony at trial.

In addition to the testimony previously discussed, the state also presented the testimony of Foote. Foote testified that, after the shooting, Bugg told him that both the defendant and Vance had attempted to rob the victim and shot at him. The state also offered the testimony of Sade Stevens, who had been at Oliphant's apartment in his bedroom when the defendant, Bugg, and Vance arrived after the shooting. She testified that she heard the defendant say that they had tried to rob the victim and that she heard Vance say that he shot the victim. However, she testified that she did not hear the defendant confess to shooting the victim. The state then had Stevens' prior statement to the police read into the record for substantive purposes under *Whelan*. In her statement, Stevens stated that she had heard both the defendant and Vance admit to shooting the victim. Further, the state offered the testimony of Omar Wilson (Omar), the defendant's uncle. Omar testified that, in May, 2010, approximately four months after the incident at issue, he saw the defendant with a gun.

Although it is true that Bugg and Vance recanted their prior statements that were admitted under *Whelan*, the jury was entitled to credit and rely on the *Whelan* statements. See, e.g., *State* v. *Dupigney*, 78 Conn. App. 111, 120–22, 826 A.2d 241 (admission of evidence identifying defendant as shooter, even if improper, was nevertheless harmless beyond reasonable doubt because, inter alia, three other witnesses also identified defendant as shooter, including witness whose identification was

State *v.* Collymore

admitted under *Whelan* because he recanted on witness stand at trial), cert. denied, 266 Conn. 919, 837 A.2d 801 (2003). This is especially so in light of the fact that, despite the recantations by Bugg and Vance, the testimony and statements that Foote and Stevens gave to the police corroborated the prior statements of Bugg and Vance that the defendant was armed with a firearm during the incident. Thus, even without the identification testimony of Robinson and George Frazier, the jury heard testimony from four other witnesses that the defendant possessed a firearm at the time of the shooting and testimony from one witness, Omar, that the defendant possessed a firearm after the shooting. That testimony establishes beyond a reasonable doubt that the jury would have returned a guilty verdict, even without the impermissible identification testimony. See, e.g., *State* v. *Artis*, 314 Conn. 131, 159–60, 101 A.3d 915 (2014) (even if identification testimony was improper, it was harmless beyond reasonable doubt because of other identification testimony by witness who personally knew defendant); *State* v. *Dupigney*, supra, 120–22 (admission of evidence identifying defendant as shooter, even if improper, was nevertheless harmless beyond reasonable doubt because three other witnesses also identified defendant as shooter).

Moreover, defense counsel had the opportunity to, and did, extensively cross-examine George Frazier about his identification testimony. See *State* v. *Artis*, supra, 314 Conn. 160–61 (considering fact that defense counsel extensively cross-examined witness in determining whether improper identification testimony was harmless). Defense counsel heavily attacked George Frazier's credibility. George Frazier continuously contradicted himself, and his response to most questions was that he had no recollection, although he already had answered most of the questions on direct examination. He also testified that he had had surgery a

State *v.* Collymore

few months after the victim's murder to remove a brain tumor. Not only did defense counsel attack George Frazier's credibility, but the state similarly questioned him about his identification of the defendant, pointing out that he never previously had identified the defendant and never told the police or the prosecutor that he had witnessed the shooting. The state even went so far as to question George Frazier about whether he "actually saw [the defendant] with a gun, or are you just saying that because you wanted to help out your brother's memory?" The state's skepticism is clear in the record.

Furthermore, in arguing to the jury that the defendant possessed a firearm during the incident, the state primarily relied on the *Whelan* statements and the testimony of Bugg and Vance, with minimal reliance on the identification testimony of Robinson and George Frazier. With regard to the charge of attempted murder, the state argued in summation to the jury: "And in this particular count, count two, it has to be that they were armed with a deadly weapon. Well, again, it doesn't have to be that they both had guns; it has to be that either [the defendant] or [Vance] must have been armed. And the testimony is, however, though, that they both had guns. [Bugg] said they did in his statement. [Vance] said they did in his statement. [Bugg] said it at the testimony he gave at the probable cause hearing, and [Vance] said it when he plead[ed] guilty to the crimes." Although the state did refer to Robinson's testimony that she saw two shooters in relation to the felony murder charge in regard to the charge of criminal possession of a firearm, the state did not rely on Robinson's testimony, arguing only: "So, the next question is, did he possess a firearm on January 18, 2010. Bugg said he had one. [Vance] said he had one." In addition to relying on the *Whelan* statements of Bugg and Vance, the state also relied on Omar's testimony that he

State *v.* Collymore

saw the defendant with a gun a few months after the victim's murder, "which means the defendant had an instrumentality of the crime.''

The state's overall reliance on the identification testimony at issue was minimal. The state referred to George Frazier only three times during closing argument—to argue the direction in which the gunshots were fired (but not who was shooting), to argue that the victim was heard calling out for his mother, and to argue that the jury should take into consideration the fact that he had had a brain tumor when considering his testimony. The state did not rely on or reference George Frazier's identification of the defendant in any way. The state, on four occasions, referenced Robinson's testimony that she saw two shooters and argued that the jury should take into consideration the fact that she was emotionally distraught when she spoke to the police when considering her testimony and statement to the police. These references, however, were overshadowed by the state's repeated references to testimony from other witnesses that the defendant possessed a firearm—specifically, nine references to the testimony of Bugg or Vance, two references to the testimony of Stevens, and three references to the testimony of Omar.

Accordingly, we conclude that, to the extent that the identification testimony of Robinson and George Frazier was improper, it was harmless beyond a reasonable doubt because it was cumulative of other identification testimony, it was subject to extensive cross-examination, it was minimally relied on by the state in closing argument, and, even without their testimony, there was sufficient evidence for the jury to find the defendant guilty beyond a reasonable doubt.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.